## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Manuel Matosantos Vallecillo and Gloria Matosantos Vallecillo; | Civil No. 19-1131 |
| Plaintiffs, | |
| v. | Re: Violations of the Racketeering Influenced and Corrupt Organizations Act; Preliminary Injunction for Enforcement of Buy-Sell Agreement; Removal of Corporate Directors; Derivative Claims for Breach of Fiduciary Duties; Dolo in the Formation of a Contract; Declaratory Judgment |
| Gerónimo Matosantos Vallecillo, personally and as trustee of the Fideicomiso Matosantos-Lewis; Federico Cardona Firpi a/k/a Federico Felices, Cynthia Matosantos de Cardona and their Conjugal Partnership; Víctor Pérez, Franziska Hanreich-Pérez and their Conjugal Partnership; Rogelio Muñoz, Alma Biblioni and their Conjugal Partnership; Matosantos Commercial Corporation; Euro-Caribe Packing Company, Inc.; Gegloma Realty Corporation; CC1 Acquisition, LLC; Insurance Companies A, B & C; Trusts I & II; John and Jane Doe 1 through 10; | Jury Trial Demanded. |
| Defendants. | |

## VERIFIED COMPLAINT

**TO THE HONORABLE COURT**:

      **COME NOW** plaintiffs Manuel Matosantos Vallecillo ("Manuel") and Gloria

Matosantos Vallecillo ("Gloria") (jointly "Matosantos Plaintiffs" or "Plaintiffs"):

### I.    Preliminary Statement

      1.    The Matosantos Plaintiffs appear before this Honorable Court to seek

redress from injuries caused by the ongoing illegal conduct of Gerónimo Matosantos

Vallecillo, Federico Cardona, Víctor Pérez, and Rogelio Múñoz (the "RICO

Defendants"). Acting as an enterprise, the RICO Defendants acquired and maintain *de facto* ongoing control of Matosantos Commercial Corporation ("MCC") and its subsidiaries, and they also conduct and participate in the conduct of MCC and its subsidiaries, through a pattern of bribes, extortion, and conspiracy, all of which constitute racketeering activity under the Racketeer Influenced and Corrupt Organizations Act ("RICO Act"). See 18 U.S.C. §§ 1961 & 1962(b)-(d).

2.      The Matosantos Plaintiffs appear before this Honorable Court to seek preliminary relief under applicable rules to enjoin Gerónimo from implementing defensive measures to prevent the sale of the Companies shares to CC1 Acquisition, LLC ("CC1") and avoiding compliance with drag along obligations under relevant stockholder agreements. Gerónimo is legally bound to sell his shares in MCC and Gegloma Realty Corporation ("Gegloma") having failed to match the terms of several offers made by CC1 and duly accepted and noticed by the Matosantos Plaintiffs, and to close the purchase and sale of the entirety of MCC's and Gegloma's stock. Gerónimo's conduct is causing irreparable harm to the Matosantos Plaintiffs inasmuch they are unable to vote their shares to appoint or remove independent directors and to pursue the disposition of their property, their shares in MCC and Gegloma, to either another stockholder or a third party, including breaching its agreements with CC1 and being subjected to liability for said acts. CC1 is joined as defendant as indispensable party to the sale and purchase transaction and to defend and/or enforce the offers as to which the Matosantos Plaintiffs seek preliminary relief.

3.     The Matosantos Plaintiffs also seek redress for blatant violations to fiduciaries perpetrated by the RICO Defendants in the process of illegally entrenching themselves in the *de facto* ongoing control of MCC and its subsidiaries. They have instituted defensive measures that curtail Matosantos Plaintiffs' fundamental stockholder rights and, separately, causes them damages and injuries. As such, in addition to prelimiary relief, the Matosantos Plaintiffs also seek ordinary relief for the RICO Defendants' illicit conduct, among other relief detailed herein.

## II.     Jurisdiction and Venue

4.     The Court has original federal question jurisdiction over the instant action pursuant to 28 U.S.C. § 1331, as this case involves substantial claims arising under the Racketeer Influenced and Corrupt and Organization Act ("RICO Act"), 18 U.S.C. §§ 1962 (b)-(d), in its civil context pursuant to 18 U.S.C. §1964(c). The Court also has supplemental jurisdiction over all other claims and petitions under Commonwealth law pursuant to 28 U.S.C. § 1367(a). Venue is proper per 28 U.S.C. § 1391(b) and (c).

## III.     Parties

*Plaintiffs*

5.     Manuel is a natural person, director and holder of fifty percent (50%) of the voting shares of defendant Matosantos Commercial Corporation ("MCC"). He is also the holder of thirty-three percent (33%) of the voting shares of Gegloma Realty Corporation ("Gegloma"). Manuel is a resident of Puerto Rico. [Exhibit ("Ex.") 1: Manuel Declaration]

6.      Gloria is a natural person and holder of thirty-three percent (33%) of the voting shares of Gegloma. Gloria is a resident of Puerto Rico.

*Defendants*

7.      RICO defendant and enterprise member Gerónimo Matosantos Vallecillo ("Gerónimo") is a natural person, director and holder of five point three eight two four percent (5.3824%) of the voting shares of MCC. He is also the holder of thirty-three percent (33%) of the voting shares of Gegloma and of thirty-three percent (33%) of the nonvoting shares of Gegloma. Gerónimo is the acting president of MCC and the president of Gegloma. He is also a member of the Board of Directors of both MCC and Gegloma. Gerónimo is included personally, but also as trustee of the Fideicomiso Matosantos-Lewis ("ML Trust") who owns forty four point six one seven six percent (44.6176%) of the voting shares of MCC and fifty percent (50%) of the nonvoting shares of MCC and of any other trusts that may own title to shares in MCC and/or Gegloma, which may include unknown defendants Trusts I & II. Gerónimo is a resident of Puerto Rico. Gloria, Manuel and Gerónimo are siblings. The ML Trust and any other unknown trust are RICO enterprise inasmuch Gerónimo's fiduciary roles facilitate the execution of the RICO Defendants ongoing pattern of unlawful actions.

8.      RICO defendant and enterprise member Federico Cardona Firpi a/k/a Federico Felices ("Federico") is a natural person and director of MCC. Federico is included personally, but also as potential trustee or substitute trustee of any other trusts that may own title to shares in MCC and/or Gegloma, which may include unknown

4

defendants Trusts I & II. Federico is Gerónimo's son-in-law and a resident of Puerto Rico.

9.      Cynthia Matosantos de Cardona is a natural person and is married to Federico, with whom she formed a Conjugal Partnership. Mrs. Matosantos de Cardona is Gerónimo's daughter and a resident of Puerto Rico.

10.     RICO defendant and enterprise member Víctor Pérez ("Pérez") is a natural person, independent director of MCC's board of directors, and illegally serves as consultant and/or contractor to MCC. Pérez is a resident of the State of Colorado, out of where he provides, invoices, and collects for consulting services to MCC. He lso provides services at MCC's facilities in Puerto Rico.

11.     Franziska Hanreich is a natural person and is married to Pérez, with whom she formed a Conjugal Partnership. Mrs. Hanreich is a resident of the State of Colorado.

12.     RICO defendant and enterprise member Rogelio Muñoz ("Muñoz") is a natural person, independent director of MCC's board of directors, and illegally provides legal and other consulting services to MCC. Muñoz is a resident of Puerto Rico, out of where he provides, invoices, and collects for his consulting services to MCC personally and through his law firm Muñoz Benítez Brugueras & Cruz ("Muñoz Law Firm").

13.     Alma Biblioni is a natural person and is married to Muñoz, with whom she formed a Conjugal Partnership. Mrs. Biblioni is resident of Puerto Rico.

14.     MCC is a domestic corporation, incorporated and registered under the laws of the Commonwealth with its principal place of business in Vega Baja, Puerto Rico. MCC is a RICO enterprise inasmuch it was corrupted by the RICO Defendants.

15.     Euro-Caribe Packing Company, Inc. ("ECP") is a domestic corporation, incorporated and registered under the laws of the Commonwealth with its principal place of business in Vega Baja, Puerto Rico. ECP is a wholly-owned subsidiary of MCC. ECP is a RICO enterprise inasmuch it was corrupted by the RICO Defendants.

16.     Gegloma is a domestic corporation, incorporated and registered under the laws of the Commonwealth with its principal place of business in Vega Baja, Puerto Rico.

17.     CC1 is a domestic limited liability corporation, organized and registered under the laws of the Commonwealth of Puerto Rico ("Commonwealth") with its principal place of business in Bayamón, Puerto Rico. CC1 is joined as defendant as indispensable party to the sale and purchase transaction and to defend and/or enforce the offers as to which the Matosantos Plaintiffs seek preliminary relief, which is raised in Count IV of this Complaint.

18.     Insurance Companies A, B & C are unknown insurance companies for the corporate defendants and/or the individual defendants, who issued insurance coverage for the actions described in the complaint for which such insurance company is jointly and/or independently liable for the events described in the complaint.

19.     Trusts I & II are unknown trusts who may have received and own title to shares in MCC and/or Gegloma. The Matosantos Plaintiffs dispute the validity  of any purported transfers of stock of MCC and Gegloma by Geronimo and ML Trust to any other trust or third party.

20.     John and Jane Doe 1 through 10 are unknown corporate and individual defendants who acted in all matters complained hereafter personally, as agents and/or as employees of the corporate and individual defendants, and who may also be liable to the Matosantos Plaintiffs.

21.     All unknown named defendants will be substituted and served process as soon as their names are known.

## IV.     <u>Relevant Facts</u>

### A.  *Background and Events Leading to the 2015 SPA*

22.     MCC is a corporation founded since 1940. MCC is dedicated to the manufacturing, marketing and distribution of institutional and consumer products in Puerto Rico, the Caribbean, regions in the United States, Latin America and Europe. [Ex. 3: MCC Certificate of Incorporation][1]

23.     ECP is a wholly-owned subsidiary of MCC, founded since 1974. ECP is dedicated to the manufacture of smoke meats and sausages under the brands "El Serranito" and "Embutidos Congusto". [Ex. 4: ECP Certificate of Incorporation]

24.     Gegloma is a corporation founded since 1982. Gegloma owns the land, buildings and leasehold improvements where MCC and EPC have their operations. Its only source of revenues is rental income generated through leasing its property  to MCC and EPC. [Ex. 5: Gegloma Certificate of Incorporation]

---

[1] Exhibit No. 2 is intentionally omitted.

25.     MCC, ECP, and Gegloma are hereinafter referred to as the "Companies".
The Companies were founded by Manuel Matosantos, Sr., late father of Gloria, Manuel,
and Gerónimo. The Companies are a family business.

26.     Before October 15, 2015, Manuel owned 55.3824% of MCC's issued and
outstanding voting shares ("MCC's voting shares"). Meanwhile, the ML Trust owned the
remaining 44.6176% of MCC's voting shares.

27.     Gerónimo is the fiduciary of the ML Trust. The ML Trust was created
under the laws of the Commonwealth on August 30, 1996, pursuant to Deed Number Six
(6) executed before Notary Ramon L. Viñas Bueso. Therefore, Gerónimo controlled
44.6176% of MCC's voting shares in his capacity as trustee of the ML Trust.

28.     Since before October 15, 2015, Gerónimo and Federico had talked about
trying to obtain control over an equal amount of MCC's voting shares. They had an
understanding that they wanted to be able to gain eventual *de facto* control and take over
MCC and its subsidiaries.

29.     In furtherance of this understanding, Gerónimo reached out to Manuel to
personally purchase from him 5.3824% of MCC's voting shares. Per the 2015 Stock
Purchase Agreement ("2015 SPA"), Manuel was made to believe that the purpose of the
transaction was Geronimo's  desire to own an equal amount of MCC's voting shares.
Federico acted pursuant to his talks with Gerónimo and actively assisted him in reaching
out to Manuel and prepararing the 2015 SPA. [Ex. 6: 2015 SPA]

30.     Gerónimo intentionally omitted to mention that he had a mutual
understanding with Federico to gain eventual *de facto* control over MCC and its

subsidiaries and take over MCC and its subsidiaries. At all times, Gerónimo merely expressed that his desire was to fulfill their parents wish for them to be in equal footing and to own an equal number of voting shares. Gerónimo appealed to Manuel's family values and emotions and moved him into reasonably believing that he and Federico had honest intentions.

31.     Manuel made the decision to execute the 2015 SPA reasonably believing in Gerónimo's representation of simply wishing to share equal title in MCC. For example, Manuel reasonably and foreseeably believed Gerónimo's deceit and omissions because they already had an agreement to receive equal compensation and benefits at MCC (the 2015 SPA did not change anything in this regard) and they already shared equal title in Gegloma's voting shares alongside their sister Gloria.

32.     At the time and to this day, Gegloma's voting and ownership structure has been the following:[2]

***Voting Shares***

| Name | Percentage of Gegloma's Voting Shares | Percentage of all shares (voting and nonvoting) |
| --- | --- | --- |
| Gloria | 33.3333% | 20% |
| Manuel | 33.3333% | 20% |
| Gerónimo | 33.3333% | 20% |
| **Total** | **100%** | **60%** |
| ***Nonvoting shares*** | | |
| Gerónimo | 0% | 13.3332% |
| Gloria Bacó Matosantos | 0% | 6.6667% |
| Jorge L. Bacó Matosantos | 0% | 6.6667% |
| José M. Matosantos González | 0% | 6.6667% |
| Ana J. Matosantos González | 0% | 6.6667% |
| **Total** | **0%** | **40%** |

[2] Gegloma's issued and outstanding voting shares are herein referred as "Gegloma's voting shares".

[Ex. 7: Gegloma's voting and ownership structure]

33.     Nevertheless, Manuel was misled by Gerónimo's and Federico's deceit and omissions concerning their true intent, which was to be able to gain eventual *de facto* control over MCC alongside Federico and take over MCC and its subsidiaries.

34.     Pursuant to this deceit and material omissions, Manuel and Gerónimo executed the 2015 SPA on October 15, 2015 and on the same date an amended shareholders agreement that increased the board of directors to seven (7) members, including three (3) independent directors. As a result, since that day MCC has had the following voting and ownership structure:

### *Voting Shares*

| Name | Number of Shares | Percentage of MCC's Voting Shares | Percentage of all shares (voting and nonvoting) |
|------|------------------|-----------------------------------|------------------------------------------------|
| ML Trust | 8,297.7992 | 44.6176% | 36.1883% |
| Manuel | 9,229 | 50% | 40.55225% |
| Gerónimo | 1,001.0228 | 5.3824% | 4.36395% |
| **Total** | **18,598** | **100%** | **81.1045%** |
| *Nonvoting shares* | | | |
| ML Trust | 2,165.6194 | 0% | 9.4477% |
| José M. Matosantos González | 1,083.1903 | 0% | 4.7239% |
| Ana J. Matosantos González | 1,083.1903 | 0% | 4.7239% |
| **Total** | **4,332** | **0%** | **18.8955%** |

[Ex. 8: MCC's voting and ownership structure]

### B.   *Shareholder Agreements for MCC and Gegloma and Relevant Rules for Governance*

35.     MCC is governed by the following documents: (i) the Puerto Rico General Corporations Law ("PRGCL"); (ii) its Certificate of Incorporation ("MCC Certificate");

(iii) the Amended and Restated Bylaws of October 15, 2015 ("MCC Bylaws"); and (iv) the Amended and Restated Shareholders Agreement of October 15, 2015 ("MCC ARSA"), as amended by the First Amendment to Amended and Restated Shareholders Agreement of August 1, 2016 ("MCC ARSA Amendment") (jointly, "MCC's Governing Documents"). [Ex. 3; Ex. 9: MCC's Bylaws; Ex. 10: MCC ARSA; Ex. 11: MCC ARSA Amendment]

36.     Gegloma is governed by the following documents: (i) the PRGCL; (ii) its Certificate of Incorporation ("Gegloma Certificate"); and (iii) the Shareholders Agreement of December 31, 1998 ("Gegloma ARSA") (jointly, "Gegloma's Governing Documents"). [Ex. 5; Ex. 12: Gegloma ARSA]

37.     These Governing Documents set the rules, restrictions, and the relationship between the shareholders of these two corporations.

38.     For example, Section 1.2 of the MCC ARSA provides that: "In the event of any discrepancy or conflict between or among any provision(s) included in the [MCC] By-Laws and any provision(s) of [the MCC ARSA], the provision(s) of [the MCC ARSA] shall govern and prevail." [Ex. 10]

39.     In Section 4 of the MCC ARSA establishes the rules for exercising the right to vote shares in MCC and to select corporate directors. It provides that: "As long as either [Gerónimo] or [Manuel] owns at least fifty percent (50%) of the outstanding Voting Shares of [MCC], then the following provisions shall apply and each of the Voting Shareholders [Manuel and Gerónimo] shall vote their respective shares in the

[MCC] as may be required in order to cause that the provisions of this [MCC ARSA] be implemented and complied with." [Ex. 10]

40.     In that regard, Section 4.1 of the MCC ARSA established the composition of its board of directors: "The Board of Directors (each, a "**Director**", and collectively, the "**Board**") of [MCC] shall consist of at least three (3) Directors but in no event more than seven (7) Directors. All Directors shall have equal vote." [Ex. 10]

41.     Now this was not all, MCC's shareholders agreed to a special composition of its board of directors. Of the seven (7) directors, four would be appointed discretionally by Manuel and Gerónimo (two each), and three (3) would be appointed by mutual consent by Manuel and Gerónimo. [Ex. 10]

42.     Section 4.2 of the MCC-ARSA clarifies this as follows: "[Gerónimo] shall have the sole and exclusive right to appoint two (2) Directors to the Board. [Manuel] shall have the sole and exclusive right to appoint two (2) Directors to the Board. **In addition, [Gerónimo] and [Manuel] shall appoint three (3) independent Directors to the Board by mutual agreement**. The independent Directors elected by mutual agreement of [Gerónimo] and [Manuel] shall be known as the 'Independent Directors'." [Ex. 10]

43.     These three Independent Directors were initially supposed to serve in staggered terms of four (4), three (3), and two (2) years. Thereafter, as the terms of each Independent Director expired, the successor Independent Director would be appointed by mutual agreement for a term of two (2) years (without term limits). [Ex. 10]

44.     MCC's Independent Directors are not merely appointed by mutual consent. They must also continually meet the following very basic requirement to ensure their independence, as expressed by Section 4.2 of the MCC ARSA: "For purposes of this [MCC ARSA], an 'Independent Director' **is a director, who is not, and for the prior three years has not been, employed by, or serving as a consultant to the Company or any of its subsidiaries**." [Ex. 10]

45.     Therefore, if an appointed independent director fails to meet this basic condition, he or she is disqualified per the MCC-ARSA to continue holding the office of "Independent Director". [Ex. 10]

46.     This is a material and reasonable condition of the MCC ARSA, which warrants disqualification and removal. [Ex. 1; Ex. 10]

47.     For example, Section 6 of the MCC-ARSA establishes an internal dispute resolution panel composed precisely of Independent Directors as arbiters. The provision mandates independence of thought and criterion. It states that:

> A panel created for the resolution of disputes **consisting of the Independent Directors of the Board** (the "**Dispute Resolution Panel**") shall resolve any dispute, controversy, or claim arising, related to deadlocks or Voting Shareholder's disputes or relating to this Agreement, or the breach, termination, or invalidity thereof. A quorum for the transaction of business of the Dispute Resolution Panel shall require the presence in person or by telephone conference at all times of a majority of the total number of Independent Directors then in office.

[Ex. 10]

48.     Another example of the materiality of maintaining independence is found the MCC ARSA Amendment, which amended Section 4.9 of the MCC ARSA to broaden

the type, kind, and number of decisions (up to thirty-three) requiring approval by the

Board. The MCC ARSA Amendment clarified that the actions listed in Section 4.9 could

be also approved by the shareholders. However, even in that case the ˜ amended article

provides that:

> In the event that any of the actions listed above is taken
> pursuant to the approval of the Shareholders owning a
> majority of the outstanding Voting Shares, such approval
> shall be confirmed in a written instrument, on [MCC's]
> official letterhead, which shall be duly signed by the
> Shareholders approving such action, and a copy of such
> written instrument shall be submitted to the Board for
> information purposes only and kept in the Company's
> books and records. Nevertheless, **should the Shareholders**
> **owning a majority of the outstanding Voting Shares fail**
> **to unanimously agree to approve any of the foregoing**
> **actions**, the Board shall have title right to decide whether
> such action is advisable or not to the Company, and
> therefore approve or disapprove the pertinent action. If the
> Shareholders owning a majority of the outstanding Voting
> Shares shall approve any of the foregoing actions, such
> approval shall not be overridden by the Board and shall be
> binding on the Board, the Company and any applicable
> subsidiary. Furthermore, it is the intent of the Shareholders
> that any subsidiaries of [MCC] shall be governed in all
> respects in accordance with the terms and conditions set
> forth in this Agreement. Accordingly, none of the
> subsidiaries of the [MCC] shall take any action if [MCC]
> would be prohibited pursuant to this Section 4. 9 from
> taking such action itself, unless and until such action shall
> be approved in accordance with this Section 4.9.

[Ex. 11]

49.     Therefore, Independent Directors wield significant responsibilities in

MCC's board of directors. Their independence is key, and they must remain independent

for the entirety of the time they hold such office. To ensure this independence, the MCC

ARSA requires that they remain in compliance with the basic requirements, which is that

14

"**an 'Independent Director' is a director, who is not, and for the prior three years has not been, employed by, or serving as a consultant to the Company or any of its subsidiaries**." [Ex. 10]

50.     This is true inasmuch Section 4.4 of the MCC ARSA provides that removal of all corporate directors remains "[s]ubject to the provisions of Section 4.2," which requires as to independent directors that they remain free from undue financial influence. [Ex. 10]

51.     Other aspects governed by MCC's and Gegloma's Governing Documents include the voting shareholders' drag-along rights with respect to the third party offer to purchase the entirety of the Companies shares.

52.     Section 7.10 of the MCC ARSA provides in no uncertain terms that:

> In the eventuality that a third party should make an offer for the purchase of the entirety of the Shares, the acceptance of such offer by the holders of fifty percent (50%) of the Voting Shares **shall oblige** the holders of the remaining Voting Shares and Non-Voting Shares **to sell** their stock under the terms of **that** offer.
>
> Nevertheless, every Shareholder shall be entitled **to match** the terms of the offer accepted by the holders of fifty percent (50%) of the Voting Shares, and to purchase the entirety of the Voting Shares and Non-Voting Shares **under said terms**. Now then, the preferential rights *granted herein* to the holders of Shares will have to be exercised, by written notice to all Shareholders, **within sixty (60) days** from the acceptance of the third-party offer by the holders of fifty percent (50%) of the Voting Shares, and **the close of the purchase and sale will have to be accomplished within the following fifty (50) days**.

[Ex. 10]

53.     This buy-sell obligation, also known as a "drag along" provision, is clear and speaks for itself. MCC's shareholders agreed to: (1) a **right to match** an offer by a third-party for the purchase of the entirety of MCC's shares **under said terms** and **within sixty (60) days** from acceptance of the third-party offer by holders of fifty percent (50%) of the MCC's Voting Shares;  and (2) an **obligation to close of the purchase and accomplish the sale within the following fifty (50) days** from matching the accepted third-party offer. [Ex. 10]

54.     The reason for agreeing to the right of first refusal includes to ensure that all family shareholders are afforded a reasonable opportunity to buy the entirety of the Companies' stock pursuant to the same terms offered by an offering third-party buyer. We must remember that the Companies are a family business and, as such, it is reasonably related to the Companies' successful continued operation as a family enterprise to offer family members a prior opportunity to purchase the entirety of the stock under the terms of a reasonable third-party offer. It also protects the interest of minority shareholders to be afforded the same prior opportunity to be able to buy the stock.

55.     Similarly, the reason for agreeing to the drag along provision is to preserve voting shareholders's proprietary right to dispose of personal assets, namely corporate stock, without undue interference or refusal from the remaining family shareholders. If the voting shareholders, following compliance of certain thresholds (the consent of fifty percent (50%) of MCC's voting shareholders and/or the majority of Gegloma's voting shareholders), agreed to sell the entirety of the Companies' stock, the

16

remaining family shareholders baragained to allow them to do so, provided the right of
first refusal. Also, this provision ensures that voting shareholders are able to negotiate the
transfer of the entirety of the Companies'stock to a third party. It also protects family
shareholders from being "left behind" with unwanted third parties as shareholders.

56.     These reasons are material and reasonably related to the Companies'
successful continued operation.

57.     Therefore, in the case of MCC, if either Manuel or Gerónimo accept an
offer from a third party to purchase the entirety of MCC's shares, the other shareholders
have a right to match the offer within sixty (60) days from acceptance and must close the
purchase and sale transaction in the fifty (50) days following the exercise of the right to
match through written notice. If the other shareholders fail to either exercise the right to
match or fail to close the purchase and sale transaction in the fifty (50) days following the
exercise of the right to match, then the accepting voting shareholder may drag along the
other shareholders and obligate them to sell under the terms of the accepted offer. [Ex.
10]

58.     Section 9 of Gegloma's ARSA speaks in nearly identical terms, except for
the percentage requirements and evaluation period timeframe. It provides that:

> In the eventuality that a third party should make an offer
> for the purchase of the entirety of the shares of Gegloma,
> the acceptance of such offer by the holders of fifty-one
> percent (51%) of the Gegloma voting shares **shall oblige**
> the holders of the remaining voting shares and non-voting
> shares **to sell** their stock under the terms of **that** offer.
> Nevertheless, every Gegloma Shareholder shall be entitled
> **to match** the terms of the offer accepted by the holders of
> fifty-one percent (51%) of the voting shares, and **to**

> **purchase** the entirety of the Gegloma shares **under said terms**. Now then, the preferential rights *granted herein* to the holders of Gegloma shares will have to be exercised, by written notice to all Gegloma shareholders, **within thirty (30) days** from the acceptance of the third-party offer by the holders of fifty-one percent (51%) of the Gegloma voting shares, and **the close of the purchase and sale will have to be accomplished within the following fifty (50) days**.

[Ex. 12]

59.     Therefore, in the case of Gegloma, if two (2) out of the three (3) Gegloma voting shareholders accept an offer from a third party to purchase the entirety of Gegloma's shares, the remaining shareholders have a right to match the offer within thirty (30) days from acceptance and must close the purchase and sale transaction in the fifty (50) days following the exercise of the right to match through written notice. If the other shareholders fail to either exercise their right to match or fail to close the purchase and sale transaction in the fifty (50) days following the exercise of the right to match, then the accepting voting shareholders may drag along the other shareholders and oblige them to sell under the terms of the accepted offer. [Ex. 12]

60.     Because MCC's voting shareholders and Gegloma's shareholders overlap when Section 9 of Gegloma's ARSA is triggered, via the acceptance of a third party offer to purchase the entirety of Gegloma's shares Section 7.1 of MCC's ARSA is also simultaneously triggered, if the offer entails the purchase of the entirety of the Companies' shares and not just Gegloma. [Ex. 10 & 12]

61.     Additionally, Section 7.1 of the MCC ARSA and Section One of the Gegloma ARSA impose upon all shareholders stock transfer restrictions. The provisions

state that: "Each Shareholder appearing herein agrees to restrict his or her rights over his or her Shares to the effect that they may only sell the same to the Company." Sections 7.2 of the MCC ARSA and Section Two of the Gegloma ARSA further extend the transfer restrictions to assigns and heirs ("The restriction for selling the Shares binds the Shareholders and the heirs and/or assigns of each of the Shareholders appearing herein.") Further, Section 7.3 of the MCC ARSA and Section Three of the Gegloma ARSA further mandate that: "No Shareholder may give the Shares in guarantee or pledge for any purpose. For this reason no lien of such nature shall be recorded in [the Company's] books." [Ex. 10 & 12]

### C. Gerónimo's Failure to Comply with Drag Along (Buy-Sell) Obligations

62.     MCC and Gegloma have been for sale since at least February of 2018. Shareholders for both companies agreed that they would seek potential bids for the sale of the entirety of its stock since at least February 13, 2018. [Ex. 13: Minutes of February 13, 2018 meeting of MCC's Board of Directors]

63.     MCC was only able to obtain reasonable offers from two (2) outside parties. The best of these offers was made by CC1.

64.     In this light, on June 28, 2018, Manuel and Gloria accepted a Non-Binding Letter of Intent ("First LOI") with the third-party CC1. This First LOI was an offer by CC1 to purchase the entirety of the MCC and Gegloma shares under the terms provided therein. Specifically, the purchase price was set at a fixed price of anu39 million dollars, plus an additional amount for the working capital at the time of closing and a final payment computed on the basis of an earn-out from the Companies performance on the

first year after their acquisition. The sellers, however, had the option to receive an additional $1 million payment at closing and forego the earnout payment.[3] [Ex. 14: First LOI]

65.     Through a letter dated on July 16, 2018 ("July 16th letter"), Gerónimo confirmed receipt of the First LOI as of July 11, 2018. In this letter, Gerónimo admitted that the First LOI was an offer to purchase the entirety of the shares of the Companies, and that Manuel and Gloria had duly accepted said offer. Gerónimo also stated that: "[P]ursuant to Article 7.10 of MCC's [ARSA], as a beneficial shareholder of 50% of the Capital Stock of MCC, upon being notified by you of the acceptance of an offer by a third party, I am entitled to exercise the preferential **right for evaluation of acquisition** granted to me, by matching the terms of the Offer **within 60 days from that date**." In other words, Gerónimo exercised his right to match and calculated the expiration of the sixty-day (60-day) evaluation period as of July 11th, concluding on Sunday, September 9, 2018. [Ex. 15: July 16th letter]

66.     Nearing the expiration of the sixty-day deadline to match, on September 8, 2018, Gerónimo notified his "decision to exercise my **right to match** the Offer ("Sept. 8th letter"). By this letter I inform the Selling Shareholders that I will purchase the Shares held by the Selling Shareholders for the *pro rata* Purchase Price stated in the Offer." Gerónimo made explicit use of the full sixty-day (60-day) timeframe by explicitly expressing that his match was effective on the following day, pushing the fifty-day (50-

---

[3] MCC, Gegloma, and Euro-Caribe Packing Company, Inc. ("Euro-Caribe") are jointly the "Companies". Euro-Caribe is a wholly-owned subsidiary of MCC. The earnout provision is duly defined in the First LOI.

day) deadline to **close of the purchase and sale until October 29, 2018.** [Ex. 16: Sept. 8th letter]

67.     Nevertheless, on October 26, 2018, Gerónimo issued yet another letter ("Oct. 26th letter") in which he wrongly expressed that he could not set the purchase price for the entirety of the shares in the Companies. In doing so, Gerónimo expressed that the fixed price part of the purchase price included in the First LOI (i.e., the $39 million) had to be drastically reduced due to the termination of an agreement between MCC and an entity named "Grupo Colón Gerena" ("GCG"). Gerónimo self-servingly alleged that said termination implied a seventeen percent (17%) reduction in the $39 million dollars purchase price established by CC1 in the First LOI ("GCG reduction"). Gerónimo also alleged other self-serving reductions in the working capital portion of the purchase price arising out of pending insurance claims for losses caused by Hurricane María, the purportedly "delicate" condition of the insurance company, allegedly possible loss of tax benefits, alleged potential tax exposure related to a tax decree applicable to Euro-Caribe, a federal judicial claim filed by a former employee for employment discrimination, and an alleged investigation being performed by BDO Puerto Rico, which purportedly could affect the amounts in escrow. Gerónimo ended his letter by calling Manuel and other shareholders to "come to an agreement over the different elements that affect the price of the shares" and unilaterally demanded ninety (90) additional days to close of the purchase of the shares under a yet unknown purchase price. All of this in clear violation of the terms of the First LOI and in total disregard of Manuel and Gloria's contractual

obligations to CC1 under the First LOI to not accept a lower offer than what they had agreed. [Ex. 17: Oct. 26th letter]

68.     It is important to emphasize at this time that the purchase price for the shares offered by CC1 and accepted by Manuel and Gloria was final and not subject to modification or discounts. **CC1 never required the GCG reduction and it would not reduce the purchase price agreed upon in the First LOI**. Another self-serving reduction is Gerónimo's refusal to consider and account for Gloria's participation in Gegloma's working capital; thus forcing her to forfeit value as part of the sale. Therefore, the self-serving considerations set forth by Gerónimo were an attempt to illegally renegotiate the purchase price premised on his unwillingness to sell his shares. Gerónimo's and Federico's efforts are clear: to force Manuel into a Catch-22. They want Manuel to decide whether to submit to Gerónimo's ongoing control of MCC's Board of Directors through illicit means or forfeit his property (the value of his shares) to Gerónimo.

69.     Nevertheless, following Gerónimo's failure to purchase the entirety of the Companies' shares at the purchase price set forth in the First LOI, Manuel, Gloria, and CC1 executed a First Binding LOI on November 8, 2018 ("First Binding LOI"). This document was executed in order to close the purchase of the shares and complete the definitive agreements with CC1, since Gerónimo had failed to purchase the shares himself within the agreed-upon deadlines in the buy-sell provisions of the ARSAs, and even attempted to renegotiate and reduce the purchase price during these deadlines to his benefit and to the benefit of his associates. The execution of this binding LOI was

expressly contemplated in the First LOI and was a logical conclusion of Gerónimo's failure to match CC1's offer. The First Binding LOI did not vary the purchase price of the First LOI. The purchase price remained at $39 million dollars, plus the working capital adjustment and the earnout amount (or the $1million payment in lieu of the earnout amount)Neither did the First Binding LOI demanded any discount for the GCG reduction; unlike Gerónimo's illegal approach. [Ex. 18: First Binding LOI]

70.    On November 14, 2018, Gerónimo responded to Manuel and Gloria concerning the First Binding LOI ("Nov. 14th letter"). In this letter, Gerónimo acknowledged receipt of the First Binding LOI and alleged that it constituted a "new offer" on behalf of CC1. Gerónimo stated in no uncertain terms that "in conformity to the terms established in Section 7.10 of the Amended and Restated Agreement for MCC and that of Gegloma I am **exercising my right to match** the new offer in the [First Binding LOI] of November 8, 2018." Gerónimo stressed his intention to purchase the shares at a reduced purchase price in comparison to both the First LOI and the First Binding LOI, per a letter sent by him to Manuel and Gloria on November 10, 2018. [Ex. 19: Nov. 14th letter]

71.    Gerónimo's Nov. 14th letter made clear that he exercised his right to match then and there (Ex. 19). The language used was nearly identical to his Sept. 8th letter (Ex. 16). Unlike his July 16th letter (Ex. 15), where he exercised "the preferential **right for evaluation of acquisition** granted to me, by matching the terms of the Offer within 60 days from that date," in the Nov. 14th letter Gerónimo knowingly bypassed the sixty-day (60-day) evaluation period and outright matched the purported new offer (Ex. 19).

Accordingly, Gerónimo triggered the fifty-day (50-day) deadline to close the purchase
and sale of shares transaction. Counting from the date of the letter, the fifty-day (50-day)
deadline to purchase under the terms of the First Binding LOI would expire on January 3,
2019.

72.     By this time, neither of Manuel or Gloria accepted Gerónimo's contention
that the First Binding LOI was in fact a new offer. Instead, their contention remained that
Gerónimo's deadline to close the purchase expired on October 29, 2018 and that the First
Binding LOI was a formal step to move ahead with closing the transaction with CC1
under the same terms of the First LOI.

73.     Accordingly, on November 16, 2018, CC1 notified Manuel and Gloria a
Second Binding LOI ("Second Binding LOI"). This Second Binding LOI, accepted by
both Manuel and Gloria, contained the same terms and conditions as the First LOI and
the First Binding LOI, except that it **increased** the purchase price by $3 million dollars;
unlike Gerónimo who had been attempting, individually and through MCC, to lower the
price of the shares for his benefit and that of his associates, as explained below. [Ex. 20:
Second Binding LOI]

74.     On November 20, 2018 ("Nov. 20th letter"), Gerónimo wrote to CC1
wrongly accusing it of tortious interference but admitting that he had "**exercised [his]**
**rights** under the Amended Shareholder Agreement of the corporations **to purchase the**
**shares of the corporations, according to the terms of [CC1's] letter of June 28, 2018**
**and/or your letter of November 8, 2018**." Therefore, without any remaining doubt,
Gerónimo in various occasions and to several parties expressed in unequivocal terms that

he had exercised his right to purchase the shares of MCC and Gegloma under the First

LOI and First Binding LOI. [Ex. 21: Nov. 20th letter]

75.     However, nowhere in the Nov. 20th letter did Gerónimo exercised his right

to purchase the shares under the terms of the Second Binding LOI. As to this new,

increased offer, the sixty-day (60-day) evaluation period expired on January 19, 2019.

[Ex. 21]

76.     The following timeline illustrates the applicable timeframes and deadlines

missed by Gerónimo for each offer made by CC1 and accepted by the Matosantos

Plaintiffs, triggering the drag-along rights in the ARSAs:



77.     In Gerónimo's continuing efforts to block and trump the purchase of the

Companies shares to the highest bidder to illegally maintain control of the Companies or

extort Manuel into forfeiting his property, on January 3, 2019, Gerónimo notified another

letter to Manuel and Gloria ("Jan. 3rd letter"). This day was Gerónimo's deadline to close

25

the purchase and sale transaction per the First Binding LOI and his Nov. 14th letter (Ex. 19). Surprisingly, in the Jan. 3rd letter, Gerónimo coincidentally notified that "after the expiration of the evaluation period provided by the Shareholder Agreements, I have decided to purchase all of your shares in the Companies, in accordance to the terms of CC1's offer of November 8, 2018." Gerónimo then counted fifty-two (52) days from the Jan. 3rd letter, until February 25, 2019, as the purported expiration of his right to close the purchase and sale of shares.[4] [Ex. 22: Jan. 3rd letter]

78.    This course of action was an obvious and illegal way to backtrack from Gerónimo's clear intentions stated in his November 14th letter, where he exercised his "**right to match** the new offer in the [First Binding LOI] of Nvember 8, 2018;" not his right to evaluate. [Ex. 19] His explicit decision to match the offer, not to merely evaluate the offer, was reiterated in the Nov. 20th letter to CC1 where Gerónimo admitted that he had "**exercised [his] rights** under the Amended Shareholder Agreement of the corporations **to purchase the shares of the corporations, according to the terms of [CC1's] letter of June 28, 2018 and/or your letter of November 8, 2018**." [Ex. 21]

79.    This matter was brought to Gerónimo's attention via a letter sent to him by both Manuel and Gloria on January 10, 2019. They indicated to Gerónimo that his Jan. 3rd letter contained characterizations and erroneous conclusions and that the deadline to close the purchase and sale transaction under the terms of the First Binding LOI expired on January 3, 2019. By the date of said letter, the sixty-day period to examine the Second

---

[4] The Matosantos Plaintiffs understand that the 52-day period does not appear in the ARSAs and is wholly unsubstantiated.

Binding LOI was still active as to Gerónimo and remaining shareholders. [Ex. 23: January 10, 2019 letter]

80.     Per communications from CC1, the Second Binding LOI was last extended for sixty (60) days after the last deadline elapses for Gerónimo under the ARSAs. Accordingly, the Second Binding LOI is enforceable against CC1 until March 20, 2019. After this day, CC1 is under no obligation to purchase and the Matosantos Plaintiffs will have irreparably lose their right and ability to dispose of their property, and may be exposed to liability too difficult to quantify.

81.     **However, as of today, Gerónimo knowingly failed to comply with his obligation to close the purchase and sale of the Companies' shares pursuant to the exercise of his right to match and is under the obligation to sale. His first deadline (October 29, 2018) elapsed without Gerónimo purchasing the shares under the terms of the First LOI. The second deadline not recognized by Manuel and Gloria but claimed by Geronimo (January 3, 2019) also elapsed without Gerónimo purchasing the shares under the terms of the First Binding LOI. Finally, and most importantly, the third deadline (January 19, 2019) elapsed without Gerónimo purchasing the shares under the terms of the Second Binding LOI**.

82.     **Furthermore, to this date Gerónimo has not shared with Manuel or Gloria, what are his financing and equity sources to raise the moneys necessary to purchase the companies and who would be the persons or entities purchasing the Companies; and to the extent that the acquisition vehicle to be used by Gerónimo is**

**not a current shareholder or includes investors with a significant amount of equity**

**that are not shareholders, they may not have a right to buy under the ARSAs.**

83.     In this context, it is important to note that all of CC1's offer contain a "no

financing contingency" provision in which the buyer is required to close the transaction

regardless of whether or not financing is available, be it CC1 or Gerónimo while

executing his right to match the terms of the offer. Any escrow accounts to be created in

connection to the transaction do not impact availability of financing and much less the

duty to purchase regardless of the availability of financing. Therefore, Gerónimo may not

be excused for lack of availability of financing. [Ex. 14, 18, 20, all at ¶ 17]

84.     **Gerónimo has anticipated his unwillingness to sell the Companies'**

**shares he owns or controls to CC1. In fact, as explained fortwith, Gerónimo and the**

**RICO Defendants have implemented a plan to gain and maintain ongoing *de facto***

**control of MCC and its subsidiaries through a pattern of bribes, extorsion, and**

**conspiracy, notwithstanding Gerónimo's buy-sell obligations. Unless Gerónimo is**

**enjoined from further obstructing the transaction with CC1 and from refusing to**

**comply with his buy-sell obligations, the Matosantos Plaintiffs will continue suffer**

**irreparable harm.**

85.     As detailed, Gerónimo is in patent breach of his personal obligations under

the ARSAs. He and the ML Trust have transferred or attempted to transfer their shares to

two trusts whose beneficiaries are totally unknown to the Companies or their

shareholders. However, when it comes to his brother and sister, he is not willing to buy or

sale his stock pursuant to the decision made by the Matosantos Plaintiffs. Gerónimo is

essentially holding them hostages until they capitulate to forfeiting their property regardless of the express terms of the ARSAs. and the offers executed with CC1. Said breach is causing and will continue to cause irreparable harm to the Matosantos Plaintiffs. They are without a remedy in law to enforce the buy-sell agreements. Gerónimo has made clear his intention not to sell his shares in both MCC and Gegloma. Therefore, the Matosantos Plaintiffs are left with no choice but to seek judicial equitable relief.

86.    Gerónimo has no legal recourse to avoid compliance with his part of the bargain under the ARSAs. Further, in his official capacity as a director, he is in breach of his duties (as are all the RICO Defendants) to all shareholders to maximize the value of the shares since the Companies were for sale in a process that had been endorsed by the board. This breach is irreparable in nature. His failure to close the purchase transaction with CC1 under the terms of the Second Binding LOI, the latest valid and enforceable offer from CC1, and in the alternative, his failure to close the purchase transaction under the terms of both the First Binding LOI and the First LOI, is causing irreparable harm to Manuel and Gloria. As such, they hereby inform that they shall seek equitable relief before a court of law to demand Gerónimo's compliance.

### D.  Defendants' unlawful activities and misconduct

#### i.  Conspiracy to acquire ongoing de facto control of MCC and its subsidiaries

87.    Sometime in 2017, Perez and Munoz joined the efforts commenced by Geronimo and Federico. The RICO Defendants reached a mutual understanding and agreement to engage in a plan and a course of action to acquire and retain ongoing *de facto* control of MCC and its subsidiaries through disbursements of money and extortion.

88.     As illustrated, Gerónimo and Federico alone may not control the decisions of MCC's board of directors. They need to control and influence at least two (2) out of three (3) Independent Directors to acquire and retain ongoing *de facto* control over MCC and its subsidiaries. [Ex. 10]

89.     Because Gerónimo and Federico had an understanding and agreement since 2015 to eventually attempt to gain control of MCC and its subsidiaries, they achieved a mutual understanding with the remaining RICO Defendants to set in motion a plan to acquire and maintain control over and influence as an association. Together with Gerónimo and Federico, Pérez was an integral part in fashioning the plan to acquire and maintain ongoing *de facto* control of MCC and its subsidiaries. Their plan was to achieve and maintain this control and influence through bribes, financial promises, and prohibited disbursements of money.

90.     As part of their plan to, once acquired, retain ongoing *de facto* control over MCC and its subsidiaries, the RICO Defendants also had a mutual understanding and set in motion a plan to extort Manuel into submitting to the RICO Defendants' *de facto* control of MCC and its subsidiaries or forfeit the value of his shares to Gerónimo, property to which Manuel is legally entitled.

91.     The plan devised and the steps to be taken were a measure to entrench themselves in the ongoing *de facto* control of MCC and its subsidiaries because Gloria and Manuel, voting shareholders, had at the time expressed a desire to dispose of their stock in the Companies. For example, on 2017, Manuel afforded Gerónimo the opportunity to purchase his stock in the Companies but Gerónimo was not able to do so.

92.     In view of Gerónimo's inability to purchase the Companies' stock, the first overt act pursuant to their plan was to investigate Gegloma's accounting as proxy to make accusations to MCC and to Manuel. Gerónimo, as president of Gegloma, hired the firm BDO Puerto Rico, LLC ("BDO") to perform an audit of Gegloma transactions. [Ex. 13] This audit would serve as basis to justify an investigation, also performed by BDO, to make accusations concerning Manuel's leadership at MCC as part of their plan to extort him. [Ex. 13]

93.     The draft of the Gegloma BDO report, dated January 31, 2018, allegedly "red flagged" transactions related to MCC. Gerónimo brought this draft to MCC's board's attention to move the machinery he had in place through the RICO Defendants to serve as basis to investigate Manuel's leadership at MCC. [Ex. 13; Ex. 24: Gegloma BDO report]

94.     The second overt act to set their conspiracy in motion was to seek Manuel's destitution as president of MCC to facilitate their take-over of MCC and its subsidiaries and facilitate the planned disbursements and financial promises. A letter was sent by Federico on January 5, 2018, requesting a meeting to consider the replacement of Manuel as president of MCC. [Ex. 25: Federico letter of January 5, 2018]

95.     During the meeting requested by Federico, held on January 22, 2018, Federico moved to seek Manuel's destitution as president of MCC under erroneous accussations of failing to meet fiduciary duties. Federico's motion to seek Manuel's destitution as president of MCC was referred to MCC's  "Panel", composed  of Pérez,

Muñoz and independent director Emilio Piñero ("Piñero") as abitrers. [Ex. 26: Minutes of January 22, 2018 meeting of MCC's Board of Directors]

96.     By this date, no investigation whatsoever had been performed or even started at MCC. This motion and subsequent actions were a joint effort from the RICO Defendants to set in motion the plan to acquire and retain ongoing *de facto* control of MCC and its subsidiaries through bribes and extortion.

97.     The next overt act took place during a subsequent meeting of MCC's board of directors, held on February 13, 2018. There, surprisingly, Federico stated that, after consulting with his attorneys, his motion to remove Manuel should not have been referred to MCC's Panel. Nevertheless, without prejudice to the process already commenced with the Panel to consider the petition for destitution, they recommended to the MCC board of directors that (a) BDO and Zayas Morazzani, PSC (ZM) be asked to audit and analyze certain cash transfers and transactions, and (ii)  Manuel and Gerónimo be allowed until March 9, 2018 to attempt to reach an agreement between them to sell or divide the businesses of MCC and its subsidiaries; otherwise a new President and Executive Vice President would be appointed to substitute Manuel and Geronimo, respectively, to commence steps for the sale of MCC and its subsidiaries. [Ex. 13]

98.     This investigation was an integral step in RICO Defendants' plan and conspiracy. Their plan to extort Manuel into either submitting to their ongoing *de facto* control or forfeit the value of his shares to Gerónimo, property to which Manuel is legally entitled is significantly predicated on being able to make accusations of potential financial exposure.

99.     The following known overt act took place during the MCC's board of director's next meeting on March 9, 2018. During this meeting, RICO Defendants appointed Pérez and Muñoz as sole members of a sub-committee to oversee the investigation to be performed by accounting firms BDO and ZM. Pérez and Muñoz would maintain communications with BDO and ZM, would oversee the work product to be performed by these firms, would oversee the information to be provided to BDO and ZM, and more importantly would direct the scope of the audit. [Ex. 27: Minutes of March 9, 2018 meeting of MCC's Board of Directors]

100.    The steps related to the BDO and ZM audit started right away. Pérez and Muñoz communicated with these firms and established a scope for the investigation. For example, an electronic document repository known as "Sharepoint" was used to exchange files and information. [Ex. 28: Scope of BDO-ZM investigation]

101.    The scope initially included to investigate disbursements paid out to Manuel, Gerónimo and former employee Miguel Pérez. It originally budgeted a total of eight (8) hours to be performed by ZM to: "Obtain a report listing disbursements to Manuel Matosantos, Miguel Perez, and Gerónimo Matosantos. Obtain description as to the nature of the payment." [Ex. 28]

102.    Pérez informed during the April 23, 2018 meeting that BDO would require six (6) weeks to complete its work. [Ex. 29: Minutes of April 23, 2018 meeting of MCC's Board of Directors]

103.    By this point, the conspiracy was moving forward smoothly with its plan to move to seek Manuel's destitution as president of MCC and its board of directors, and

to make accusations of potential financial exposure in order to extort Manuel into forfeiting the value of his shares to Gerónimo, property to which Manuel is legally entitled.

104.    In anticipation of the legal repercussions that their conspiracy could create, on April of 2018, Gerónimo arranged for the transfer of his shares in MCC and Gegloma owned by him and ML Trust to two (2) newly created trusts without notifying MCC, Gegloma or their respective shareholders, and in blatant violation of the transfer rules in the ARSAs. Hence, although for purposes of this complaint we are assuming that Geronimo is acting under the terms of the ARSAs it is entirely possible that Geronimo, personally and through his actions, forfeited his right to match any offer from a third-party under the ARSAs.

105.    Contemporaneously, Gerónimo and Federico started making illicit bribes to Pérez and Muñoz, through promises of future payments and causing MCC to make current payments disguised as consulting services, accused Piñero of not having "independent judgement", and threatened litigation to have him removed from the board. Noticeably, Piñero is the only MCC independent director who has not offered consulting services to MCC.

106.    Through this "two- pronged" strategy, Gerónimo and Federico would be able to gain and retain influence over the "Independent Directors" and obtain *de facto* control over MCC's board of directors through disbursements disguised as payments for services.

ii. *Bribery of MCC's Independent Directors Pérez and Muñoz*

107.    One important part of the conspiracy came to fruition on June 8, 2018.
During this meeting of MCC's board of directors, the RICO Defendants voted in favor of
Manuel's temporary destitution as president of MCC, with three (3) votes against the
determination. This unprecedented board action was taken on the basis of an alleged
informal verbal report presented at the board meeting by Pérez and Muñoz regarding
some preliminary observations allegedly made to them by BDO. BDO and ZM had
commenced their work in late April 2018. Contrary to the earlier board decision and
written engagements with ZM and BDO, it now appears that the investigations were
directed exclusively to Manuel. [Ex. 30: Minutes of June 8, 2018 meeting of MCC's
Board of Directors]

108.    This milestone cleared up the path for the RICO Defendants to pay bribes
and promises to Pérez and Muñoz. As stated, being able to maintain influence over Pérez
and Muñoz through payments and promises of future economic benefits, as bribes, to act
in their favor and in association with them is an integral part of the plan to maintain
ongoing *de facto* control of MCC and its subsidiaries and to extort Manuel.

109.    As still director and voting shareholder holding fifty percent (50%) of
MCC's voting shares, after his suspension Manuel was never inquired about making
payments to Pérez or Muñoz for services purportedly offered to MCC. Nearing or
following his temporary destitution, Manuel did not agree to any such payments. Neither
did Ana J. Matosantos González ("Ana") or Piñero as MCC's other board members. As a
result, these payments were made in blatant violation of the provisions of the MCC

ARSA that require authorization by the board of directors to payments or transactions with officers or directors. For example, Section 4.9(xiii) of the MCC ARSA, as amended by the MCC ARSA Amendment, requires prior approval of all transactions between MCC and its subsidiaries with shareholder, directors, officers or their spouses, children, or affiliates of the foregoing.

110.    The payments made to Pérez and Muñoz constitute a bribe under federal and state law, paid by Gerónimo both personally and through MCC.

*Pérez's payments*

111.    Pérez admitted in emails to collecting for services purportedly offered to MCC.

112.    In one email, dated July 14, 2018, Pérez admitted that on a monthly basis for the previous months he had been providing services alongside former employee Karen Nolla in the analysis of "her numbers", which varied month to month. [Ex. 31: Emails dated on July 14, 2018] For these purported services, Pérez billed MCC per the invoice number I-0004. [Ex. 32: Pérez's Invoice to MCC Number I-0004]

113.    In a second email dated that same day, Pérez admitted that there were contracts as to which he was purportedly invoicing but that had not been presented to MCC's voting shareholders for prior written approval, as required by the MCC-ARSA Amendment. [Ex. 31]

114.    In this same email, Pérez admitted in multiple instances and in multiple ways that he invoiced and collected payments for purported consulting services to MCC, all while holding the office of MCC's independent director. [Ex. 31]

115.    Pérez explained that he worked on three (3) projects allegedly discussed with MCC's Board of Directors and others admittedly not discussed with the Board of Directors. [Ex. 31]

116.    Pérez invoiced and collected payments as bribes through hours invoiced to MCC in invoices I-0004 and I-0005. [Ex. 32; Ex. 33: Pérez's Invoice to MCC Number I-0005]

117.    Specifically, Pérez invoiced $125.00 per hour of consultancy purportedly provided from the State Colorado and $200.00 per hour of consultancy purportedly provided from Puerto Rico. [Ex. 34: Pérez's email of July 14, 2018]

118.    As stated, during the month of April, Pérez had started invoicing and collecting payments from Gerónimo through MCC. [Ex. 32]

119.    By July 2018, Pérez collected from Gerónimo, through MCC, an amount not less than $31,236.03 in purported consulting services. [Exs. 32-33]

120.    Gerónimo was the sole person who authorized these illegal disbursements. [Exs. 31 & 34-35]

121.    For example, emails show that Gerónimo authorized the disbursement of $16,875.00 to Pérez on June 18, 2018. [Ex. 35: Gerónimo's email authorizing payment to Pérez of June 18, 2018]

122.    Also, emails show that Gerónimo authorized Mr. Serafín Massol ("Massol"), current Chief Financial Officer hired by Pérez, made clear that a significant portion of said payment **would allegedly require higher retention having been**

**provided out of Colorado**. Massol was brought into MCC by Pérez, his close acquaintance.[5] [Ex. 36: Emails Serafín Massol]

123. It is important to note that Pérez is a Colorado resident. Therefore, for the services he renders in Puerto Rico, he is subject to a higher withholding rate for Puerto Rico income taxes.

124. Additionally, during a meeting of MCC's Board of Directors held on November 27, 2018, Gerónimo provided a digital document via email titled "Board of Directors Financial Presentation Package October 2018.pdf." [Ex. 37: Board of Directors Financial Presentation Package October 2018]

125. In the page marked by hand as "8F", number 41 of 50, titled "Professional Services Expense Analysis", it is made clear that Pérez continued collecting payments as bribes disguised as payment for services and expense reimbursements. [Ex. 37 at 41]

126. These additional payments were made during the months of August through October.

127. Specifically, under "Other Professional", account number 9698, which is dedicated to registering payments to Pérez in his character as independent director, it appears that Pérez received payments in an amount not less than $13,495 for the months of August through October of 2018. [Ex. 37 at 41]

128. Therefore, in 2018 alone, Pérez accepted payments as bribes an amount not less than $44,731.03.

---

[5] Pérez has hired other personal friends in his effort to exercise ongoing de facto control over MCC. For example, he also hired Mr. Diego Chévere, his personal financial advisor, to allegedly serve as temporary

129.     Pérez collected illicit payments at least during the months of August through October of 2018. [Exs. 32-33 & 37]

130.     However, for the remainder of 2018 and 2019, Pérez entered into an agreement with MCC for the payment of $15,000.00 per month in alleged consultancy fees. This agreement is of an ongoing nature and has never been approved, much less submitted for prior approval, to Manuel as required by MCC ARSA Amendment.

131.     It is inferred that the payments made by MCC to Perez have really been payments made for services provided by Pérez to Geronimo related to his possible acquisition of the Companies. Because of these payments and the expectation of future payments, Pérez has been assisting Geronimo in seeking equity and debt investors for the purported acquisition of MCC and Gegloma. Moreover, Pérez has led an effort to reduce the purchase price of the Companies by manipulating the working capital of MCC. Since, June 28, 2018, when the First LOI was executed, through the efforts of Pérez, MCC reduced its working capital by an excess of $2.3 million dollars through a mix of aggressive inventory write-offs, unnecessary reserves for accounts payable and the implementation of new accounting practices that are not in accordance with historical practices and many times do not even comply with generally accepted accounting principles (" GAAP" ). All of these while continuing to act as independent director of MCC and playing a key role on the termination of Manuel's employment on November 28, 2018.

---

chief financial officer and now as consultant to MCC.

132.    These payments and the ongoing contract and arrangement with Pérez constitute a bribe to favor Gerónimo and Federico and acquire and maintain ongoing *de facto* control over MCC and its Board of Directors.

133.    Pérez has an understanding with Gerónimo and Federico to receive additional compensation for assisting Gerónimo in purchasing and then managing the companies if he is able to complete their acquisition.

134.    As stated, Pérez is a resident of the State of Colorado and admitted in emails to having received payments for services allegedly rendered out of the State of Colorado.

135.    Per Colorado's statute against commercial bribery and breach of duty to act disinterestedly: "A person commits a class 6 felony if he solicits, accepts, or agrees to accept any benefit as consideration for knowingly violating or agreeing to violate a duty of fidelity to which he is subject as: . . . (d) Officer, director, partner, manager, or other participant in the direction of the affairs of an incorporated or unincorporated association; or; . . . (f) Arbitrator or other purportedly disinterested adjudicator or referee. . . ." Colo. Rev. Stat. Ann. § 18-5-401 (West). Under Colorado law, a class 6 felony is punishable by one (1) year to eighteen (18) months of imprisonment. *See* Colo. Rev. Stat. Ann. § 18-1.3-401 (West).

136.    Having solicited, accepted and agreed to accept payments out of Colorado to knowingly associate with Gerónimo and Federico to gain and maintain ongoing *de facto* control of MCC and its subsidiaries, violated his duties as independent director and

arbiter of the Panel. Therefore, each time Pérez collected these payments he violated Colorado's commercial bribery and breach of duty to act disinterestedly statute.

137.    This misconduct also constitutes violations of the federal Travel Act, 18 U.S.C. § 1952(a). Pérez traveled through interstate commerce with intent to collect these payments as bribes for favoring Gerónimo and Federico. He and MCC used electronic mail to send invoices and send and receive payment related information. Gerónimo also caused MCC to use wires and checks to effectuate these payments, with the intent to commercially bribe Pérez.

### *Muñoz payments and promises*

138.    In the case of Muñoz, he also collected payments for purported services to MCC invoiced through the Muñoz Law Firm.

139.    However, in an email dated on May 7, 2018, sent by counsel for MCC's Board of Directors, it is established that that Muñoz's compensation was never agreed-upon between Manuel and Gerónimo. [Ex. 38: Email dated May 7, 2018]

140.    Appearing from the digital document via email titled "Board of Directors Financial Presentation Package October 2018.pdf," the Muñoz invoiced and collected payments through the Muñoz Law Firm during 2018. Muñoz is a partner at the Muñoz Law Firm. [Ex. 37]

141.    For the month of October 2018, the Muñoz collected through the Muñoz Law Firm an amount near to $3,761.00. [Ex. 37]

142.    Additionally, during the November 28, 2018 meeting of MCC's Board of Directors, Gerónimo admitted that the corporation had been paying Muñoz for services,

which is likely in addition to the amounts reflected in the presentation package. [Ex. 39: Excerpt from Transcript of MCC's Board of Directors meeting of Nov. 28, 2018]

143.     In addition to the ongoing payments for services, the day after Muñoz was entrusted by MCC's Board of Directors to identify potential buyers for the entirety of MCC's shares, Muñoz sought from Manuel and Gerónimo a broker's fee that could have reached a million dollars in connection to the sale of the Companies. [Ex. 40: Muñoz's proposal for brokerage fee of May 1, 2018]

144.     On April 23, 2018, according to the minutes of the meeting of MCC's Board of Directors held that day, Muñoz had the duty to seek offers from potential buyers to sale the entirety of MCC's shares. [Ex. 29]

145.     Then, on May 1, 2018, Muñoz submitted to Manuel and Gerónimo a written proposal to invoice legal services on a monthly basis and to obtain a broker's fee in connection to a potential future sale. Muñoz offered to obtain one percent (1%) of the total purchase price paid up to a purchase price of $25 million dollars plus three percent (3%) in the case of purchase price in excess of $25 million dollars. Per the Second Binding LOI, considering working capital estimates at the time, this arrangement would have represented a broker's fee of $1.3 million dollars. [Ex. 40]

146.     Via email on May 15, 2018, Manuel informed Gerónimo his rejection of Muñoz proposal. [Ex. 41: Email dated May 15, 2018]

147.     Nevertheless, Muñoz has an interest in a potential sale of the Companies on Gerónimo's behalf in the case Manuel surrenders to the extorsion being perpetrated upon him on the case the Companies are sold to buyers other than CC1.

148.     This is based upon the fact that his proposal for legal services entailed discounting from the future broker's fees all amounts billed previously on a monthly basis and that Munoz has been actively assisting Gerónimo on matters related to the purchase of the company.

149.     Federico is financially vested with Gerónimo to attempt to acquire through extortion and intimidation the entirety of the Companies' shares from Manuel and Gloria.

150.     As further evidence of the fact that Muñoz is financially vested in the association with the remaining RICO Defendants to extort Manuel and benefit from Manuel's forfeiture of his property, Gerónimo, with the support of RICO Defendants Federico, Pérez, and Muñoz, established a sub-committee of MCC's board of directors composed of Federico, Pérez, and Muñoz to evaluate potential offers and make recommendations upon these offers.

151.     This sub-committee is illegal per Article 3.1 of the MCC Bylaws.

152.     Pérez and Muñoz both invoiced and collected payments as bribes purportedly for the time devoted to this illegal committee. [Exs. 32, 33, 39]

153.     Muñoz may also have an undisclosed broker's fee agreement with Gerónimo and Federico, and may also be financially vested with Gerónimo, as Federico, to attempt to acquire through extortion and intimidation the entirety of the Companies' shares from Manuel and Gloria. Munoz had a legal obligation to bring any such arrangements to the attention of the Board and should have step down as an independent director.

154.    These payments and the ongoing contract with Muñoz and the Muñoz Law Firm constitute bribes under Puerto Rico law. *See* P.R. Stat. Ann. Tit. 33 § 5350. Muñoz, as arbiter of the Panel, solicited and received payments and fees, for himself and for the Muñoz Law Firm, with the understanding that such payments and fees would influence his decisions and votes as an arbiter of the Panel to benefit Gerónimo and Federico in furtherance of the RICO Defendants' plan to obtain and retain ongoing *de facto* control of MCC and its subsidiaries and to extort Manuel.

155.    These payments and the ongoing contract with Muñoz and the Muñoz Law Firm also constitute bribes under the federal Travel Act. *See* 18 U.S.C. § 1952(a). Muñoz used mail and electronic mail to send these proposals, invoices, and to collect these payments. Gerónimo also caused MCC to use wires and checks to effectuate these payments, with the intent to bribe Muñoz to influence his actions and decisions as independent director and arbiter of the Panel.

156.    The above-referenced misconduct, as it related to the bribes and commercial bribes knowingly solicited and collected by Pérez and Muñoz, also constitute unlawful activity under the meaning of the RICO Act as to Gerónimo.

157.    Under Puerto Rico law, any person who, directly or indirectly, gives or promises an arbiter money or any benefit with the intent to influence his or her actions and decisions incurs in bribery which entails a conviction of imprisonment in excess of one (1) year.

158.    In this case, as described herein, Gerónimo knowingly, through himself and through MCC, gave and promised Pérez and Muñoz money, fees, value, and future

financial stake with the intent to influence their actions and decisions as independent directors and arbiters of the Panel. Gerónimo caused MCC to issue payments to Pérez both in Puerto Rico and in Colorado. He also caused MCC to make payments to Muñoz and to Muñoz Law Firm and promised broker's fees to Muñoz personally.

### iii. _Extortion of Manuel and Gloria on behalf of RICO Defendants_

159.    Another crucial part of the conspiracy is the ongoing extortion of Manuel and the intimidation caused to Gloria.

160.    The common goal of the RICO Defendants was to acquire _de facto_ control of MCC and its subsidiaries for the purpose of entrenching themselves in such control. That way, they would continue to hold a prestigious office, have almost unfettered access to funds for personal profit and expenses, and pay and receive significant monthly payments from MCC.

161.    This, however, was not enough. Since Manuel is holder of fifty percent (50%) of MCC's voting shares and one third (33.3333%) of Gegloma's voting shares, as well as Gloria in the latter entity, they will always remain in a position to force a purchase and sale transaction in the individual character as voting shareholders.

162.    Therefore, to diffuse such possibility, the RICO Defendants achieved a mutual understanding to extort Manuel and to intimidate Gloria attempting to ensure that these are not able to take the _de facto_ control away from the RICO Defendants in the foreseeable future.

*Extortion of Manuel*

163.     As to Manuel, the ongoing extortion scheme is straightforward and dates at least to the end of 2017.

164.     As stated, Gerónimo, using Gegloma as proxy and his control over Gegloma as its Presidents to his benefit, caused an investigation of transactions related to MCC under Manuel's leadership. The understood purpose of which being that it would serves as basis for the RICO Defendants to move to seek Manuel's destitution as president of MCC and its board of directors. [Exs. 13, 23-24]

165.     Afterwards, the RICO Defendants approved and oversaw an investigation, carried out by accounting firms BDO and ZM, into transactions of MCC related to Manuel, Gerónimo, and former employee Miguel Pérez. [Ex. 13, 25-26]

166.     The oversight of the investigation was spearheaded by Pérez with the help of Muñoz both members of the enterprise with the remaining RICO Defendants. [Ex. 13]

167.     Though initially it would take BDO six (6) weeks to complete the process [Ex. 28], at some point during its work Pérez instructed BDO to, instead of reviewing transactions by Manuel, Gerónimo and Pérez, focus its investigation exclusively on Manuel. As stated, the investigation would originally include three (3) persons in management, namely Manuel, Gerónimo, and former employee Miguel Pérez. [Ex. 28] However, along the way, the RICO Defendants agreed to focus the audit on Manuel alone, which Pérez carried out.

168.     Therefore, the investigation failed to adequately audit Gerónimo's transactions, as its original scope of work indicated.

169.    Nevertheless, following months of investigation, lasting until November 27, 2018, BDO finally submitted its tainted report and investigation. [Ex. 42: BDO Report as of November 27, 2018]

170.    As expected, the BDO report made wrongful accusations of mismanagement and reporting concerning Manuel and his individual taxes. The report also made erroneous conclusions omitting and ignoring information and documents in the possession, control, and custody of MCC and its subsidiaries.

171.    In summary, the BDO report wrongly accused Manuel of causing MCC to have a purported potential tax exposure nearing $700,000.00, purportedly including tax exposure, interest and penalties.

172.    The investigators for BDO never made any attempt to meet with Manuel or corroborate their findings with him. Nor did they make a presentation to the MCC board of directors of afforded an opportunity for the directors to review the report or to make questions regarding the same. Despite the requests of various board members to have BDO present directly to the Board, the RICO Defendants opposed and banned any such opportunity to the other Board members to hear and make questions to BDO.

173.    Instead as a *fait accompli,* an unsigned final report dated November 27, 2019 was presented by Pérez and Muñoz on the board meeting of November 28, 2018, and without any semblance of fairness or due process, such report was used as the excuse for terminating Manuel as president of MCC during the course of that meeting. [Ex. 42; Ex. 43: Minutes of November 28, 2018 meeting of MCC's Board of Directors]

174.    Furthermore, with the report as sword, Gerónimo has attempted to discount the value of MCC shares for his sole and exclusive benefit by the exposure amount allegedly caused by Manuel to MCC. In other words, Gerónimo is using to his sole benefit the alleged tax exposure amounts that Manuel allegedly caused to MCC to pay to Manuel less money than he is entitled for his shares in the Companies.

175.    Gerónimo has indicated that he will cause MCC to pursue collection efforts and damages on behalf of MCC, based on the BDO report, if Manuel fails to accept a proportional discount of said amounts from the price Gerónimo (not MCC) must pay to Manuel in order to be able to purchase the entirety of the Companies' shares.

176.    Therefore, one form of extortion materialized inasmuch Gerónimo purports to have the power to harm Manuel economically. Manuel reasonably believes that Gerónimo and the remaining RICO Defendants, as *de facto* controlling group of MCC, will use that power to deprive him of the value of his shares, property to which he is legally entitled.

177.    Another event of extortion caused upon Manuel is an essential element of the ongoing nature of the RICO Defendants pattern of racketeering activities.

178.    The RICO Defendants, having acquired and maintaining ongoing *de facto* control of MCC and its subsidiaries through a scheme of bribes now have cornered Manuel into classic illegal scheme: either submit permanently to the *de facto* control of MCC and its subsidiaries by the RICO Defendants and tolerate the continuation of bribes to both Pérez and Muñoz or forfeit his property to Gerónimo through an undue discount in the sales price of his shares.

179.     The common goal of the RICO Defendants conduct is to gain and maintain ongoing *de facto* control of MCC and its subsidiaries. To do so, Gerónimo and Federico must be able to continue to bribe Pérez and Muñoz as independent directors, unless all four RICO Defendants somehow acquire *de jure* control of the Companies pursuant to a stock purchase transaction with the Companies' remaining shareholders.

180.     As such, the extortion and the threat of continuing racketeering activity is clearly evidence by the fact that RICO Defendants' scheme is dependent upon continuing illegal bribes in one hand and in another, through fear of financial loss and the loss of his right as shareholder to meaningfully vote his shares to decide matters of MCC and its subsidiaries and to appoint truly independent directors, force Manuel to forfeit his property in the form of the value of his shares.

181.     Under Commonwealth law it is extorsion when a person through intimidation obligates another to forfeit property or to tolerate acts occurring after the intimidation. *See* P.R. Stat. Ann. Tit. 33 § 5261. Similarly, under the federal Hobbs Act, extorsion means "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. §1951(b)(2).

182.     The extortion and threat of future extortion being inflicted upon Manuel clearly violates both Commonwealth and federal extorsion statutes. Gerónimo has attempted to intimidate Manuel into forfeiting his property in Gerónimo's sole benefit with the threat of financial risk, the threat of loss of rights as voting shareholder of MCC and its subsidiaries, and the threat of having to tolerate future bribes to independent

directors and the ongoing *de facto* control of MCC and its subsidiaries by the RICO Defendants.

### *Extortion of Gloria*

183.    In the case of Gloria, Federico has consistently attempted to intimidate and harass Gloria through insults proffered through phone calls and text messages sent over cellular waves and data. On many occasions he has copied Gloria Bacó Matosantos and Jorge Bacó Matosantos, Gloria's adult children, fully aware that, Gloria Bacó Matosantos works for MCC and that losing her job would put additional economic pressure on Gloria.

184.    In a text message sent on November 21, 2018, Federico expressed the following to Gloria:

> Hi, Gloria. Honestly, I cannot stay silent at the abuses and disrespect that you have demonstrated to your brother Gerónimo. When you needed him to protect you, you used him knowing very well that he could have gone and sold without you. It causes me embarrassment that I have to write you these words to you, but the reality is simple, you betrayed your brother who was trying to protect your interests and you aligned yourself with who robbed you. Manuel does not care about anything other than destroying Gerónimo. Don Manuel and Doña Gloria [Manuel's, Gerónimo's and Gloria's late parents] would be ashamed by your behavior.

[Ex. 44: Letter of January 15, 2019]

185.    Not being enough, on November 26, 2018, Federico wrote to Gloria Jr. and Jorge Jr., Gloria's adult children, the following content, among other, in a text message: "You used my father-in-law, you betrayed him and now you want to take more money from him. I wonder if at any moment you have reflected about all of this from a

family panorama or if the Matosantos identity totally died. **Instead of family it appears a brothel where loyalties are exchanged for money and sacrifices are honored with stabbing.**" [Ex. 44]

186.    Federico's choice of language is troubling since he has acted violently. He has also threatened to intentionally cause serious damage to the reputation of family members as part of the conspiracy.

187.    Federico continued with his clear push to have Gloria and Manuel forfeit their property: "Reflect and talk to your conscience, have the dignity to facilitate and not demand. Greed causes many people to lose everything, I believe that through deep reflection of this situation you will notice that the damage that you have caused Gerónimo is still reparable. I exhort you to contact him and try to reach a just and reasonable agreement to end this nightmare. This also is my family." [Ex. 44]

188.    However, on January 11, 2019, Federico went all in and wrote to Gloria and her adult children that "I do not know what your financial situation is but every time you sign a letter, Gloria, I feel you are stabbing your brother Gerónimo. I urge you to have them have you meet with Gerónimo and reach an agreement. Each letter that you sign are unnecessary stabs without merit. Recapacitate your position, your brother defended you in your weakest moment and now for a few lousy dollars you are stabbing your brother." [Ex. 44]

189.    In a final message, Federico crowned his harassment and intimidation stating to Gloria: "**Family is honored with respect; whores are bought with money.**" [Ex.44]

190.     As stated, under Commonwealth law extorsion is when a person through intimidation obligates another to forfeit property or to tolerate acts occurring after the intimidation. See P.R. Stat. Ann. Tit. 33 § 5261. Similarly, under the federal Hobbs Act, extorsion means "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. §1951(b)(2).

191.     Federico's harassment, threats, bullying, and name-calling all amount to intimidation for the purpose of inducing Gloria into not selling her shares in Gegloma or forfeiting a significant portion of the value of her shares. Federico is attempting to obtain property from Gloria and her family, with their consent, induced by wrongful use of threats and fear. Threats such as "greed causes many people to lose everything" together with "I do not know what your financial situation is but every time you sign a letter, Gloria I feel you stab your brother Gerónimo." Federico is clearly referring that the RICO Defendants will not think twice to use their financial resources and ongoing *de facto* control over MCC to perhaps cause Gloria and her family to lose everything. [Ex. 44]

### E.  *Breach of Fiduciary Duties*

192.     MCC has been for sale for at least since February 13, 2018, according to the minutes from MCC's Board of Directors held that day. Nevertheless, the RICO Defendants, acting jointly, seized ongoing *de facto* control over MCC and implemented defensive measures aimed at derailing the sale of the Companies to entrench themselves in said *de facto* control. This course of action on their behalf has caused and will continue to cause injuries upon Manuel, directly as stockholder. Instead of assisting the selling

shareholders to maximize the value of the company they have been assisting Gerónimo to purchase the Companies at the lowest possible price in total disregard of the fiduciary duties to such selling shareholders.

193.    Among the defensive measures implemented, without limitation, the RICO Defendants conspired and executed the following defensive measures: (i) instituted an illegal committee to evaluate purchase offers in violation of the MCC-ARSA which caused *ultra vires* expenses and costs; (ii) changed valid historical accounting practices which resulted in a reduction in the valuation of MCC and its subsidiaries, which was executed with the purpose of reducing the value of MCC and its subsidiaries; (iii) modified depreciation methods to also reduce the value of MCC and its subsidiaries; (iv) promoted and used the termination by GCG to reduce the value of MCC and its subsidiaries; (v) made unreasonable inventory purchases to negatively affect working capital levels, causing undue expenses and costs; (vi) ordered an investigation into Manuel to create basis for further extracting value from Manuel through extorsion, causing undue expenses and costs; (vii) unilaterally and illegally modified this investigation to center it on Manuel and exclude Gerónimo in order to wrongly accuse Manuel of wrongdoing, increasing the costs and expenses related to the investigation; (viii) adjusted accounting of expenses related to insured damages to reduce balance sheet numbers and affect the value of MCC and its subsidiaries; (ix) offered and accepted payments as bribes to gain *de facto* control of MCC and its subsidiaries, causing expenses and costs; and (x) Gerónimo used purported credits of MCC to extort Manuel into selling

shares to him for a discounted value, thus obtaining for himself the value of such credits which purportedly belonged to MCC and its subsidiaries.

194.   When a corporate board implements anti-sale measures there arises an omnipresent danger that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders. This potential for conflict places upon the RICO Defendants the burden of proving that they had reasonable grounds for acting in such way.

195.   Nevertheless, when MCC was officially for sale, which documents show that this is the case since at least one year ago, the duties of the RICO Defendants immediately changed from the preservation of MCC and its subsidiaries **to the maximization of MCC's value at a sale for the stockholders' benefit**.

196.   In said light, the RICO Defendants utterly and completely failed to comply with their duties as corporate directors. In doing so, the RICO Defendants resorted to illegal activity to ensure they maintain ongoing control over MCC and its subsidiaries.

197.   All corporate directors owe fiduciary duties to a corporation's shareholders. In this case, the RICO Defendants have, directly and indirectly, breached their fiduciary duties to the Manuel and Gloria, directly. Their common purpose to acquire and maintain ongoing *de facto* control of MCC and its subsidiaries through a pattern of racketeering activity is in clear conflict of interest with Manuel's and Gloria's right to vote their shares under the ARSAs. In the case of Gloria, while not an MCC stockholder, the decisions made by MCC under the illegal control of the RICO Defendants violates her right to dispose of property. Similarly, they have perpetrated acts

that directly breach and deny Manuel his right to elect and remove independent directors and to participate in matters of corporate governance of MCC and its subsidiaries. Also, the defensive measures designed and implemented by the RICO Defendants are illegal and constitute a bad faith breach of their fiduciary duties to the MCC's shareholders and to the Companies' shareholders in the case of Gerónimo.

198.    As stated, the enterprise created by RICO Defendants caused Manuel and Gloria significant damages. They have incurred in expenses and have suffered great emotional harm. For instance, Federico has gone as far as directly harassing and threatening Gloria with text messages expressing to her in connection with her desire to sale her shares in Gegloma that: "**Family is honored with respect; whores are bought with money**." These and other flagrant insults and profanity is evidenced in a letter sent to you by Gloria's counsel on January 15, 2018. [Ex. 44]

199.    In another example, Manuel has incurred in significant expenses in defending himself from ill-motivated accusation and the *de facto* loss of his rights as shareholder of MCC and inability to dispose of his property per the terms of the ARSAs.

200.    He has also suffered emotional distress caused by the extortion his being subjected to by the RICO Defendants. Injuries will continue to accrue if the sale to CC1 per the terms of the Second Binding LOI is not immediately achieved.

201.    Accordingly, Manuel hereby demands that Gerónimo, in his capacity as voting shareholder, closes the purchase and sale of the Companies' shares with CC1 per the terms of the Second Binding LOI, in order to avoid further irreparable injuries. Additionally, in his capacity as director and officer of MCC, Manuel hereby demands

that the MCC's Board of Directors, as controlled by the RICO Defendants, cease and desist of further implementing defensive measures and revert all illegal measures taken to their original state.

202.   Manuel also demands, derivatively on behalf of MCC an amount not less than $1,500,000.00 as a result of the illicit expenses, payments, disbursements, losses, and other ill-motivated decisions.

203.   It is important to note at this stage that it is Manuel's position that the investigation and report rendered by BDO Puerto Rico is inaccurate, based on deceit and material omissions, and illegally centered on Manuel to protect and benefit Gerónimo and the Enterprise. This report was a tool used by the Enterprise in furtherance of its efforts to achieve ongoing *de facto* absolute control of MCC and its subsidiaries.

204.   For example, the BDO report failed to assess payments made to Gerónimo not reported to the corresponding tax authority. These include the over $300,000.00 paid to Gerónimo in excess of the amounts paid to Manuel. Additionally, payments made by MCC to Mrs. Carmencita Quiñones, who was the exclusive nanny and driver of Gerónimo's youngest daughter, were knowingly omitted from the report as instructed by Pérez in furtherance of the RICO Defendants' plans. Therefore, for this and other reasons, the report is of limited reliability and a mere measure to force Manuel to forfeit the value of his shares through illicit means.

205.   No degree of accusations or claims against the Matosantos Plaintiffs will overcome independent and separate contractual duties in the form of stock restrictions voluntarily assumed by Gerónimo in not once, but two instances. Geónimo voluntarily

acknowledged this duty in writing in repeated occasions. The RICO Defendants acts are jeopardizing the very existence and viability of MCC and its subsidiaries. In turn, Gegloma's very existence and viability is by its nature joined with the success of MCC and its subsidiaries.

206.    In a related topic, Manuel also submits that his termination as President of MCC and its Board of Directors was wrongful and illegal. His termination was part of the RICO Defendants' plan and pattern to maintain ongoing *de facto* control of MCC and its subsidiaries. This wrongful action was perpetrated as a pretext to dismiss Manuel from his employment, influence, and income. The purpose was to corner Manuel in furtherance of the extorsion scheme. This constitutes additional economic and emotional losses to Manuel.

### F.  *Dolo in the Formation of the 2015 SPA*

207.    As stated, prior to October 15, 2015, Manuel was the majority stockholder of MCC, holding 55.3824% of MCC's voting shares. Nevertheless, pursuant to malice, intent, undue influence, and insidious machinations perpetrated by Gerónimo in agreement with Federico wrongly induced Manuel into executing the SPA.

208.    Both Gerónimo and Federico omitted material representations that if proffered would have caused Manuel not to execute the SPA. For example, Manuel and Gerónimo failed to disclose that their plan was to illegally gain *de facto* control of MCC and to strip Manuel of the value of his credit pursuant to the SPA. At all times Gerónimo represented to Manuel that the sole purpose of the SPA was to be equals. This is proven false.

209.    Perhaps more importantly, Gerónimo agreed to a sales price when entering into the SPA and to making payments as agreed therein. Now, as part of the RICO Defendants' plan to extort Manuel, Gerónimo has expressed the real intention to fail to make additional pending scheduled payments to Manuel ($548,279). The purpose of this position is to force Manuel to forfeit his credit pursuant to the SPA or submit to the ongoing *de facto* control of MCC by the RICO Defendants.

210.    As such, through insidious machinations, which include verbal and written communications regarding Gerónimo's willingness to pay the full price agreed for the share and his understanding that said price was a fair under prevalent market conditions and the terms of the MCC ARSA, Gerónimo induced Manuel into selling him 5.3824% of MCC's voting shares. Gerónimo also failed to disclose his agreement with Federico to set a plan in motion to gain ongoing *de facto* control of MCC and its subsidiaries through a pattern of bribes and extortion.

211.    Accordingly, Manuel hereby demands the annulment of the 2015 SPA and subsequent transfer of shares to Gerónimo.

### V.    Causes of Action

#### A.    Count One: Violation of Section 1962(b)

212.    The allegations contained in all preceding paragraphs are incorporated herein as to the Matosantos Plaintiffs.

213.    The Matosantos Plaintiffs are persons per 18 U.S.C. § 1961(3).

214.    Gerónimo, Federico, Pérez and Muñoz are also persons per 18 U.S.C. § 1961(3).

ADC

215.    RICO Defendants Gerónimo, Federico, Pérez and Muñoz are associated in fact for the common purpose of acquiring and maintaining ongoing *de facto* control over and corrupt MCC and ECP through a pattern of bribes, extortion, intimidation, and conspiracy. This unlawful conduct affects interstate commerce directly inasmuch MCC and ECP have business that extends beyond Puerto Rico and into regions of the United States, and they use means of interstate commerce, such as commercial airplanes, emails and cell phones in furtherance of their unlawful activity. In fact, Pérez has his residence in the State of Colorado.

216.    RICO Defendants' common purpose of maintaining ongoing *de facto* control and corrupt MCC and ECP depends on the continued pattern of bribes, extortion and intimidation.

217.    RICO Defendants are related as an enterprise inasmuch the hold meetings to discuss how to disburse bribe payments, how to extort and intimidation Manuel and Gloria, and to come to the mutual understanding of carrying out the above unlawful activity. They are all members of MCC's board of directors and manage the affairs of the Companies unfetteredly.

218.    RICO Defendants have conspired and taken steps in furtherance of their conspiracy since at least late 2017. Nevertheless, their common purpose of maintaining ongoing *de facto* control over and corrupt MCC and ECP through a pattern of bribes, extortion, intimidation, and conspiracy has not ended. It is ongoing and relies on the continued pattern of bribes and extortion.

219.    All RICO Defendants participated knowingly, willfully and recklessly in the operation and management of their association in fact. Gerónimo is the leader since he controls 50% of MCC's voting shares and 33.3333% of Gegloma's voting shares. He is also the president of MCC and Gegloma. ECP is a wholly owned subsidiary also managed by Gerónimo. Federico is Gerónimo's right-hand man. He is Gerónimo's family appointee to MCC's board of directors. He has caused and promoted Manuel's destitution as part of the enterprise's purposes and has personally harassed and intimidated Gloria through a chain of text messages sent over cellular waves and data. Pérez and Muñoz are essential inasmuch their votes as MCC's independent directors and Panel members is crucial to Gerónimo and Federico acquiring and maintaining ongoing *de facto* control of the Companies. Their decision-making power and roles, specially including their role as Panel arbiters, ensure that Gerónimo and Federico hold *de facto* control of the Companies.

220.    The RICO Defendants' scheme does not have an end in sight. Their goal was not only to acquire, but also to maintain ongoing *de facto* control of the Companies. To do so, especially in the case of MCC and ECP, they need to continue their pattern of conspiracy, bribes, extortion, and intimidation. This is supported by allegations and evidence which show that Pérez has an ongoing monthly contract for $15,000.00 with MCC, which is paid as a pretext to influence his decision-making as independent director and arbiter and to assist and favor Gerónimo and Federico in the acquisition of the Companies to the detriment of Manuel and Gloria. Muñoz started to bill for legal services to MCC through the Muñoz Law Firm and has a vested financial interest in any purchase

of the Companies by Gerónimo. These payments and promises are also made to influence his decision-making as independent director and arbiter. Additionally, the RICO Defendants must continue to extort Manuel and Gloria. They will continue to intimidate Gloria in order to convince her not to sell her shares and force a purchase and sale transaction to a third party. As for Manuel, they will continue to corner him and have him choose between accepting the ongoing *de facto* control of the Companies through a pattern of conspiracy, bribes, and extorsion, or forfeit his property and sell his shares to Gerónimo at a significantly reduced price. This also applies to Gloria inasmuch Gerónimo insist on having Gloria forfeit her participation in Gegloma's working capital or risk losing her right to sell her property to a third party. The pattern and the common purpose is open ended: to maintain into the foreseeable future ongoing *de facto* control of MCC and its subsidiaries through a pattern of unlawful activities.

221.    The Companies were corrupted by the RICO Defendants with the goal of continuing a scheme of conspiracy, bribes and extortion to financially benefit themselves, entrench themselves in the *de facto* control of MCC and its subsidiaries, and enrich themselves at the expense of Manuel, Gloria, and the remaining shareholders.

222.    The RICO Defendants' unlawful actions have caused the Companies, Manuel and Gloria irreparable injuries. The RICO Defendants have also caused MCC to make illegal payments in amounts north of $100,000.00. It has also caused the payment of the ZM and BDO reports in furtherance on their illegal conduct, which cost is estimated in an amount no less than $250,000.00. Their actions have also affected the business reputation of MCC and ECP in an amount estimated not less than

$1,000,000.00. Their actions have also imputed and attempted to create financial liability upon Manuel in an amount not less than $700,000.00. These unlawful actions also may expose Manuel and Gloria to liability as to CC1 since they are compelled to sale their stock and they have no way of avoiding said situation which difficult to calculate. Also, through their unlawful actions, RICO Defendants infiltrated the control of MCC causing Manuel to lose property rights as shareholders of MCC inasmuch it will remain under the ongoing *de facto* control of the RICO Defendants. He will lose the right to vote his shares in aspects of corporate governance, which is the main element that gives value to his shares and to his property rights in those shares. This property loss is irreparable in its very nature and not easily quantifiable. The case of Gloria is the same as Manuel but as to Gegloma inasmuch Gegloma's revenue-generating activity is a lease to MCC, which is controlled *de* facto by the RICO Defendants through a pattern of racketeering activity. This property loss is irreparable in its very nature and not easily quantifiable. These injuries stem both from RICO Defendants' acquisition or control of an interest in the Companies and from their conduct and participation in the enterprise. However, pursuant to 18 U.S.C. § 1964(c), threefold the damages and the cost of the suit are requested of the RICO Defendants, who are jointly and severally liable.

### B.  Count Two: Violation of Section 1962(c)

223.    The allegations contained in all preceding paragraphs are incorporated herein as to the Matosantos Plaintiffs.

224.    For the same reasons expressed in the preceding Count One of this Complaint, Manuel and Gloria are entitled to recover damages for the RICO Defendants unlawful conduct.

225.    RICO Defendants Gerónimo, Federico, Pérez and Muñoz are associated in fact to conduct and participate, directly or indirectly, in the affairs of the Companies through a pattern of conspiracy, bribes, and extortion to cause property damages to Manuel and Gloria.

226.    As stated, the RICO Defendants' unlawful actions have caused the Companies, Manuel and Gloria irreparable injuries. The RICO Defendants have also caused MCC to make illegal payments in amounts north of $100,000.00. It has also caused the payment of the ZM and BDO reports in furtherance on their illegal conduct, which cost is estimated in an amount no less than $250,000.00. Their actions have also affected the business reputation of MCC and ECP in an amount estimated not less than $1,000,000.00. Their actions have also imputed and attempted to create financial liability upon Manuel in an amount not less than $700,000.00. However, pursuant to 18 U.S.C. § 1964(c), threefold the damages and the cost of the suit are requested of the RICO Defendants, who are jointly and severally liable.

### C.  Count Three: Violation of Section 1962(d)

227.    The allegations contained in all preceding paragraphs are incorporated herein as to the Matosantos Plaintiffs.

228.     RICO Defendants conspired to unlawfully infiltrate, acquire, and maintain ongoing *de facto* control of the Companies and to conduct the affairs of the Companies through a pattern of conspiracy, bribes, extortion, and intimidation.

229.     Therefore, for the same reasons expressed in the preceding Counts One and Two of this Complaint, Manuel and Gloria are suffering irreparable injuries and are also entitled to recover damages for the RICO Defendants unlawful conduct for an additional amount not less than $100,000.00. However, pursuant to 18 U.S.C. § 1964(c), threefold the damages and the cost of the suit are requested of the RICO Defendants, who are jointly and severally liable.

### D.  Count Four:
### Preliminary Injunction – Enforcement of
### Drag Along (Buy-Sell) Provision

230.     The allegations contained in all preceding paragraphs are incorporated herein as to the Matosantos Plaintiffs.

231.     As stated, Gerónimo has no legal recourse to avoid complying with the clear and unambiguous terms of the ARSAs. Gerónimo failed to close the purchase and sale of the Companies' shares under the terms of the First LOI and the First Binding LOI. Ultimately, Gerónimo failed to exercise his right to match the Second Binding LOI. Therefore, Gerónimo is obligated to sell the entirety of the Companies' shares he owns personally or controls as trustee. Otherwise, the Second Binding LOI is enforceable against CC1 until March 20, 2019. After this day, CC1 is under no obligation to purchase and the Matosantos Plaintiffs will have irreparably lose their right and ability to dispose of their property, and may be exposed to liability too difficult to quantify.

232.    As is known, a party moving for a temporary restraining order and/or preliminary injunction must show (i) a probability of success on the merits; (ii) the potential for irreparable injury; (iii) that the balance of equities favor issuance of preliminary relief; and (iv) that public interest favors issuance of injunction.

233.    In this case, as stated, Gerónimo has no legal recourse to shy away from his obligation to sell the Companies' shares to CC1 per the terms of the Second Binding LOI. In other words, nothing excuses Gerónimo's compliance. This stems from the facts alleged herein and the clear timeframes established in the ARSAs, which contain reasonable stock restrictions enforceable upon Gerónimo. Moreover, it stems from Gerónimo's pattern of racketeering activity being conceived and perpetrated to entrench himself and the other RICO Defendants into the ongoing *de facto* control of the Companies. Therefore, the Matosantos Plaintiffs respectfully submit that probability of success is abundant.

234.    Courts dealing specifically dealing with corporate rights have held that where the legal right granted by the law appears to be clear, where interference with that legal right will necessarily occur in the absence of injunctive protection, and where it reasonably appears that money damages cannot adequately compensate for the interference with that legal right, the irreparable injury requirement is satisfied. Also, it constitutes a fundamental offense to the dignity of the corporate office for a director to use corporate power to seek to coerce shareholders in the exercise of the vote and to implement defensive mesures to avoid the sale of corporate stock. Irreparable harm also exists because damages would be difficult to calculate. An intrusion upon a fundamental

stockholder rights guaranteed by statute, regardless of duration, is an injury not reasonably compensable by damages. Finally, a strong showing of success on the merits may compensate for a weak showing of irreparable harm. Regardless of any administrative, financial, or other types of differences between the parties, Gerónimo is bound to comply with the drag along provisions in the ARSAs. No degree of accussations or claims against the Matosantos Plaintiffs will overcome independent and separate contractual duties in the form of stock restrictions voluntarily assumed by Gerónimo in not once, but two instances. Geónimo voluntarily acknowledged this duty in writing in repeated occasions. The RICO Defendants acts are jeopardizing the very existence and viability of MCC and its subsidiaries. In turn, Gegloma's very existence and viability is by its nature joined with the success of MCC and its subsidiaries.

235.    In this case, these thresholds are clearly met. Manuel's and Gloria's legal right to vote their shares to sell and enforce the sale of the entirety of the Companies' shares is clear from MCC's and Gegloma's Governing Documents. Under the PRGCL, stockholders in Puerto Rico corporations have a legal right to control and vote their shares in their own interest. This is fundamental stockholder right guaranteed by the PRGCL. However, Gerónimo will continue to interfere with that legal right to vote indefinitely and will never sale his stock under the terms of any of the offered made by CC1 and accepted by Manuel and Gloria, pursuant to reasonable stock restrictions agreed-upon in the ARSAs. He will continue to exert his influence to implement defensive measures aimed at avoiding his duty to sell and to avoid the purchase from CC1. Instead, he has instituted a scheme to entrench himself and the remaining RICO

Defendants in the ongoing *de facto* control of the Companies. Money damages will not suffice to cover the loss of Manuel's and Gloria's right to vote their share, to govern the affairs of the Companies, and to appoint truly independent directors. In any case, money damages would be extremely difficult to calculate. Finally, considering the strong showing of success on the merits, the showing of irreparable injury and the difficulty required to calculate damages is attenuated.

236.     The Matosantos Plaintiffs have been placed by the RICO Defendants in the precarious situation of breaching their duties towards CC1 as a result of overtly illegal acts, while having no adequate available legal remedy to redress the situation.

237.     Similarly, in the context of balance of the equities, the Manuel's and Gloria's potential injuries significantly outweighs any harm which granting injunctive relief would inflict upon Gerónimo. Gerónimo would simply be subject to comply with his legal and contractual obligations. Nothing more than what he bargained for at the highest price offered by CC1. Gerónimo agreed to the terms of the ARSAs, agreed to match certain offers, but failed to close the purchase and sale following various attempts to undercut the price to his benefit through the described unlawful actions. He also failed to exercise his right to match CC1's Second Binding LOI. As such, granting the relief sought of enjoining Gerónimo and ordering him to sale the shares he owns and controls in the Companies to CC1 simply subjects him to what he bargained. Instead, denying the injunction would permit him and the RICO Defendants to continue their ongoing scheme and pattern of racketeering activity which is causing irreparable injuries to Manuel and Gloria and economic and business injuries to Manuel, Gloria and MCC. Perhaps just as

pervasive, denying relief will cause Manuel and Gloria to effectively lose their right to vote their shares under the ARSAs, including without limitation their right to vote their shares to sale the entirety of the Companies' shares to a third party or to participate meaningfully in the affairs of the Companies.

238.    Lastly, public interest is benefited from issuance of the injunction inasmuch it would entail an end to the otherwise ongoing and indefinite pattern of bribes, extortion, conspiracy, and intimiation being perpetrated by the RICO Defendants. It will also protect the fundamental stockholder rights necessary to the principles of corporate democracy preserved by the PRGCL.

239.    Furthermore, the issuance of an injunction will recognize corporate charters and contracts as binding legal instruments and in the process providing essential stability to business dealings.

240.    Accordingly, considering the above and as argued in a motion in support of this preliminary relief petition filed with this Complaint, the Matosantos Plaintiffs hereby respectfully move the Court to issue a Preliminary Injunction to enjoin Gerónimo to sell the Companies' shares he owns and controls, and to execute the definitive agreement with CC1 per the terms of the Second Binding LOI or, in the alternative, per the terms of the First Binding LOI or the First LOI.

### E.  Count Five: Permanent Injunction – Removal of Corporate Directors

241.    The allegations contained in all preceding paragraphs are incorporated herein as to Manuel.

242.    As independent directors, Pérez and Muñoz had an obligation to remain independent for as long as they held such office at MCC's board of directors. This obligation is established in Section 4.2 of the MCC ARSA, which is material and its violation constitutes grounds for disqualification and removal.

243.    Pérez and Muñoz have obtained payments as bribes to influence their required independence as part of their duties as directors and arbiters per the MCC ARSA. These payments were pretextually categorized as consulting or legal services to MCC. In either case, these payments run afoul of their duties under Section 4.2 and warrant their disqualification.

244.    Pérez has been specifically apprised by Manuel of this prohibition. In writing, Manuel has raised the issue of the payments being grounds for disqualification, conflict and removal. Pérez responded to these communications dismissively but admitting to the illegal conduct.

245.    As such, Manuel hereby moves the Court to declare and order the disqualification and removal of Pérez and Muñoz from MCC's board of directors.

### F.  Count Six: Declaratory Judgment

246.    The allegations contained in all preceding paragraphs are incorporated herein as to the Matosantos Plaintiffs.

247.    The Matosantos Plaintiffs respectfully move this Court to declare that: (a) Gerónimo is legally bound by the ARSAa to execute the sale and purchase of the Companies' shares to CC1 under the terms of the Second Binding LOI or, in the alternative, the First Binding LOI or the First LOI; (b) Gerónimo is incurring in defensive

measures as to MCC that are causing the Matosantos Plaintiffs irreparable harm; and (c) that Pérez and Muñoz are disqualified to act as independent directors of MCC and their removal is proper.

### G.  Count Seven: Breach of Fiduciary Duties, Direct Action

248.    The allegations contained in all preceding paragraphs are incorporated herein as to the Matosantos Plaintiffs.

249.    In this case, the RICO Defendants have, directly and indirectly, breached their fiduciary duties to the Manuel and Gloria, directly. Their common purpose to acquire and maintain ongoing *de facto* control of MCC and its subsidiaries through a pattern of racketeering activity is in clear conflict of interest with Manuel's and Gloria's right to vote their shares under the ARSAs. In the case of Gloria, while not an MCC stockholder, the decisions made by MCC under the illegal control of the RICO Defendants violates her right to dispose of property. Similarly, they have perpetrated acts that directly breach and deny Manuel his right to elect and remove independent directors and to participate in matters of corporate governance of MCC and its subsidiaries. Also, the defensive measures designed and implemented by the RICO Defendants are illegal and constitute a bad faith breach of their fiduciary duties to the MCC's shareholders and to the Companies' shareholders in the case of Gerónimo.

250.    These actions caused and continue to cause damages to the Matosantos Plaintiffs. These damages, the loss of the right to vote and dispose their shares, and the right to elect corporate directors, are fundamental stockholder rights. The loss of these

rights is of irreparable nature. The RICO Defendants are joint and severally liable for these injuries. These injuries are irreparable and difficult to calulcate.

### H.  Count Eight: Breach of Fiduciary Duties, Derivative Action

251.    The allegations contained in all preceding paragraphs are incorporated herein as to Manuel.

252.    The defensive measures designed and implemented by the RICO Defendants are illegal and constitute a bad faith breach of their fiduciary duties to the MCC's shareholders and to the Companies' shareholders in the case of Gerónimo. Nevertheless, these defensive measures also caused damages and losses to the Companies.

253.    The following defensive measures, without limitation, implemented caused losses to MCC: (i) instituted an illegal committee to evaluate purchase offers in violation of the MCC-ARSA which caused *ultra vires* expenses and costs; (ii) changed valid historical accounting practices which resulted in a reduction in the valuation of MCC and its subsidiaries, which was executed with the purpose of reducing the value of MCC and its subsidiaries; (iii) modified depreciation methods to also reduce the value of MCC and its subsidiaries; (iv) promoted and used the termination by GCG to reduce the value of MCC and its subsidiaries; (v) made unreasonable inventory purchases to negatively affect working capital levels, causing undue expenses and costs; (vi) ordered an investigation into Manuel to create basis for further extracting value from Manuel through extorsion, causing undue expenses and costs; (vii) unilaterally and illegally modified this investigation to center it on Manuel and exclude Gerónimo in order to

wrongly accuse Manuel of wrongdoing, increasing the costs and expenses related to the investigation; (viii) adjusted accounting of expenses related to insured damages to reduce balance sheet numbers and affect the value of MCC and its subsidiaries; (ix) offered and accepted payments as bribes to gain *de facto* control of MCC and its subsidiaries, causing expenses and costs; and (x) Gerónimo used purported credits of MCC to extort Manuel into selling shares to him for a discounted value, thus obtaining for himself the value of such credits which purportedly belonged to MCC and its subsidiaries.

254.    These breaches caused loss in value, expenses, costs and loss of credits for MCC in an amount not less than $3,000,000.00 owed by the RICO Defendants, jointly and severally, to MCC.

### I.   Count Nine: Annulment from Dolo in the Formation

255.    The allegations contained in all preceding paragraphs are incorporated herein as to Manuel.

256.    As indicated, Manuel signed the 2015 SPA pursuant to deceit and material omissions on behalf of Gerónimo. Manuel reasonable relied in Gerónimo's expressions and averments as complete. Any reasonable person his position would have relied in such expressions and averments provided that notwithstanding Manuel's sophistication, Gerónimo relied on the fact that he was his brother and to deeply emotional feeling concerning their parents' desire. The consent given has proven to cause damages to Manuel as stated and plead herein. This deceit and material omissions, given by Gerónimo with intent to defraud Manuel, constitute insidious machinations on behalf of Gerónimo that vitiate and void the consent given by Manuel to execute the 2015 SPA.

257.    Accordingly, Manuel hereby moves the Court to declare the annulment of the 2015 SPA and enjoin Gerónimo and Manuel to return to each other the consideration exchange, namely the 5.3824% of MCC shares transferred to Gerónimo and the moneys paid so far to Manuel, both with corresponding interests and dividends.

### J.   Count Ten: Fraudulent Conveyance

258.    The allegations contained in all preceding paragraphs are incorporated herein as to the Matosantos Plaintiffs.

259.    Transactions in fraud of creditors may be rescinded. Any person who has acquired in bad faith things alienated in fraud of creditors is liable for the damages caused whenever it is impossible to return the things so acquired.

260.    In this case, it is believed that Gerónimo, in his role as trustee, may have transferred some or all the MCC shares owned by the ML Trust to other unknown trusts, without complying with the MCC ARSA or applicable law.

261.    Accordingly, if any such transfer occurred, Manuel hereby moves the Court to declare such transfer invalid per the terms of the MCC ARSA. Additionally, if such transfer occurred and makes impossible the return of the shares as requested in Count Nine, Manuel hereby moves the Court to rescind any such transaction and order the return of said shares to Manuel. Likewise, if the Matosantos Plaintiffs cannot fully recover an award from Gerónimo's present and future estate, they hereby move the Court to rescind any such transfer effectuated to an unknown trust or to any unknown third-party which may be discovered during litigation.

**WHEREFORE**, the MatosantosPlaintiffs respectfully moves this Court to enter a preliminary and permanent injunction order, and judgment as follows:

a.  Issuing a Preliminary Injunction to enjoin Gerónimo from implementing defensive measures and to compel the sale of the Companies' shares that he owns and controls, and to execute the definitive agreement with CC1 per the terms of the Second Binding LOI or, in the alternative, per the terms of the First Binding LOI or the First LOI, per Count Four and Seven of this Complaint.

b.  Issuing a Permanent Injunction to enjoin Pérez and Muñoz from further occupying the office of independent directors of MCC's board of directors, per Count Five of this Complaint;

c.  Enter judgment ordering the RICO Defendants to pay, jointly and severally, to Manuel and Gloria an amount not less than $2,150,000.00, plus applicable interest, threefold damages, and litigation costs, per Counts One through Three of this Complaint;

d.  Enter judgment declaring that: (1) Gerónimo is legally bound by the ARSAa to execute the sale and purchase of the Companies' shares to CC1 under the terms of the Second Binding LOI or, in the alternative, the First Binding LOI or the First LOI; (2) Gerónimo is incurring in defensive measures as to MCC that are causing the Matosantos Plaintiffs irreparable harm; and (3) that Pérez and Muñoz are disqualified to act as independent directors of MCC and that their removal is proper, per Count Six of this Complaint;

e.   Enter judgment ordering the RICO Defendants to pay, jointly and severally, to MCC an amount not less than $3,000,000.00, plus applicable interest, per Count Eight of this Complaint;

f.   Enter judgment declaring the annulment of the 2015 SPA and instruct Gerónimo and Manuel to return to each other the consideration exchanged, namely the 5.3824% of MCC shares transferred to Gerónimo and the moneys paid so far to Manuel, both with corresponding interests and dividends, per Count Nine of this Complaint;

g.   Enter judgment rescinding any transfer of shares from the ML Trust to any other trust or third party per the terms of the MCC-ARSA, and any fraudulent transfer of property by the RICO Defendants to a third party per applicable law, pursuant to Count Ten of this Complaint;

h.   Order the payment of costs and attorney's fees, as applicable under the law; and

i.   Order any other form of relief proper in law or equity.

***RESPECTFULLY SUBMITTED***.

[*Signature Page Follows*]

| Dated: February 8, 2019<br>San Juan, Puerto Rico | *s/Lee R. Sepulvado Ramos*<br>Lee R. Sepulvado Ramos<br>USDC-PR Bar No. 211912<br><br>*s/Aníbal J. Núñez González*<br>Aníbal J. Núñez González<br>USDC-PR Bar No. 230101<br><br>**SEPULVADO, MALDONADO & COURET**<br>304 Ave. Ponce de León<br>Suite 990<br>San Juan, PR 00918<br>Telephone: (787) 765-5656<br>Fax: (787) 294-0073<br>lsepulvado@smclawpr.com<br>anunez@smclawpr.com<br><br>*Counsel to Manuel Matosantos Vallecillo* |
|---|---|
|  | *s/Raúl González Toro*<br>Raúl González Toro<br>USDC-PR Bar No. 213105<br><br>**RAÚL GONZÁLEZ TORO LAW OFFICE LLC**<br>Popular Center Suite 1028<br>208 Ponce de León Ave.<br>San Juan, PR 00918<br>Telephone: 787-753-6090<br>Mobile: 787-640-0628<br><br>*Counsel to Gloria Matosantos Vallecillo* |